CLARK, IN RE.

Common Pleas Court, Lucas County.

No. 59723. Decided September 22, 1962.

22

Mr. *John M. Mahoney*, for the child.
Mr. *James Nestroff*, for the surgeon.
Mr. *Walter Kobil*, for the parents.

ALEXANDER, J. On September 6, 1962 the Court received from officials of Mercy Hospital an application for authority to administer blood transfusions to one Kenneth Clark, aged 3 years. The original application was oral; later that day it was supported by a written statement.

It was made to appear that the child was suffering second and third degree burns over 40% of his body; that he had been received a few days before from a hospital in an adjoining county which did not feel itself so well equipped to handle this very exacting case; that the child's blood condition was deteriorating, and it might become necessary at any time to administer blood transfusions; that the child's parents refused to authorize same because the religious sect to which they belong (Jehovah's Witnesses) forbids it as violating certain Biblical injunctions;

that the hospital and attending surgeon could not adequately or safely treat the patient without the authority sought.

Ohio's Juvenile Code empowers the juvenile court to protect the rights of a child in this condition:

"Section 2151.33, Revised Code * * *. Upon the certificate of one or more reputable practicing physicians, the court may summarily provide for emergency medical and surgical treatment which appears to be immediately necessary for any child concerning whom a complaint or an application for care has been filed, pending the service of a citation upon its parents, guardian, or custodian. * * *"

Even without this specific authorization we believe the court would have had ample power to act summarily under its broad equitable jurisdiction. We accordingly made the following docket entry:

"9-6-62: It appearing to the Court that an emergency exists in that Kenneth Clark, a minor, aged 3 years, has been critically burned and in order to save his life a blood transfusion will become necessary, and it further appearing that the said Kenneth Clark is a child whose condition is such as to warrant the State in the interest of the child in assuming his guardianship, authorization is hereby given to Dr. James G. Sullivan or other competent member of the medical staff of Mercy Hospital, to administer any and all blood transfusions necessary in the premises, any objection to the contrary notwithstanding. It is further ordered that such child be not removed from said Mercy Hospital without the consent of Dr. James G. Sullivan."

Counsel for the parents promptly protested verbally to the Court, and demanded to be heard and to cross-examine the doctors. Accordingly, a hearing was scheduled at an early date and the parents, hospital authorities and attending surgeon were cited.

Now, we have long noted in the reported cases dealing with children's rights, a tendency to identify them with parental rights, i. e., to regard them as identical. This is quite understandable, but not always correct. One doesn't have to work in a family court very long to learn that in countless circumstances a juvenile's rights and interests at many points are at sharp variance with those of his parents. This case clearly

promised to be one such, so we entered the following on the court docket:

"9-10-62. It appearing that a conflict of interest may develop between parents and child, John M. Mahoney, Esq. is hereby assigned as legal counsel for the child, Kenneth Clark."

The parents attacked the order of 9-6 authorizing blood transfusions, moving to vacate it on these major grounds:

1. No emergency existed in fact.

2. The order is void because made before the parents were cited to appear.

3. The statute under which it was made is unconstitutional and violates the due process clause of the 14th Amendment.

4. Blood transfusions are dangerous and contrary to good medical practice.

5. Blood transfusions are forbidden by Holy Scripture.

To take up these points in order:

1. The evidence showed that at the moment of the order the child was not at death's door, but that his blood condition had been steadily deteriorating, and if he were allowed to continue without a blood transfusion he might die. The witness James G. Sullivan, M. D., the attending surgeon, testified that he did not then know how long the child could live without a transfusion, but that he "did not propose to find out." Out of consideration for the parents' feelings he postponed giving one until a week after he received authorization, and from that time the deterioration ceased and the child's condition showed steady improvement.

The witness made it clear that whether or not the situation was emergent at the time he sought the court authorization, nevertheless it was pregnant with emergency in that the need for blood might become imperative at any moment, and for the child's sake the attending surgeon did not dare cast himself in the role of a foolish virgin.

This evidence was uncontroverted and therefore the Court finds that an emergency did exist within the purview of the statute, and moreover one such as to warrant the court's intervention under its broad equitable powers.

2. True, the emergency order was issued before the parents were notified or hearing was had. Although conforming to statute, this was in contravention of the orderly processes of

the law in litigation seeking ordinary remedies. But the law provides extraordinary remedies too;. e. g., the temporary restraining order, whereby, for cause shown, the court may act first and inquire later.

Where a child's well-being, especially his life, is concerned, it would be precisely preposterous to withhold all measures in his behalf until a time for hearing had been found (or made) in the court's overflowing calendar; notices had been prepared; citations had been served; and hearing held—at best a week or two later. By that time the child might be cold in his grave.

The court had not only the right but the duty to act in the child's behalf first and give the parents their day in court later. Incidentally, the parents were in constant touch with the doctor and hospital, and had full knowledge of what was taking place.

None of counsel's numerous authorities on the necessity of notice, process, etc., strike us as being applicable to this set of facts, and we hold the order is not void for want of proper service.

3. The complaint that the parents were deprived of "due process" can only mean that they were deprived of life, liberty or property without due process. This imports an unpleasant consideration, to say the least.

There was no syllable of suggestion, much less evidence, that they were deprived of their life or of their liberty. This leaves only their property. What the parents were deprived of was their *claimed* right to deny their child certain. treatment which medical science deemed necessary. Would this be a property right? Do the parents *own* their child's body? Is he their *chattel*?

It is true that parents exercise a dominion over their child so mighty and yet so minute as to be sometimes frightening. For example, they determine whether and whom the child may marry (see Section 3101.01, Revised Code); whether and where he goes to school or college; which, if any, religious faith he may espouse; where he shall live; whether and where he may work, find his recreation, and so on; even whether he wears his rubbers, his pink tie, or she has her hair bobbed. Parents may, within bounds, deprive their child of his liberty and his property.

But there are well-defined limitations upon this appalling

power of parent over child. In a very recent book edited by juvenile judges for juvenile judges (Procedures and Evidence in Juvenile Court), the preface by Milton G. Rector of the National Council on Crime and Delinquency begins with the phrase: ''As early as its first decade, the twentieth century was popularly dubbed 'the century of the child.' '' The rise of the juvenile court movement, the development of the U. S. Children's Bureau, the decennial White House Conferences on Children, are among the dozens of evidences that spring to mind in support of this thesis. The New York State Children's Bill of Rights lists eleven natural and moral rights with which every child is endowed, and which no person would willingly deny.

No longer can parents virtually exercise the power of life or death over their children. No longer can they put their child of tender years out to work and collect his earnings. They may not abuse their child or contribute to his dependency, neglect, or delinquency. Nor may they abandon him, deny him proper parental care, neglect or refuse to provide him with proper or necessary subsistence, education, medical or surgical care, or other care necessary for his health, morals, or well-being; or neglect or refuse to provide the special care made necessary by his mental condition; or permit him to visit disreputable places or places prohibited by law, or associate with vagrant, vicious, criminal, notorious or immoral persons; or permit him to engage in an occupation prohibited by law or one dangerous to life or limb or injurious to his health or morals. (See Section 2151.03, Revised Code.) And while they may, under certain circumstances, deprive him of his liberty or his property, under no circumstances, with or without due process, with or without religious sanction, may they deprive him of his *life*!

The evidence was undisputed that blood transfusion was necessary and the best available medical opinion held that to deprive the child of it would have been to risk his life. We hold the parents had no right to subject their child to such a risk, and there could have been no violation of the 14th Amendment; and that Section 2151.33, Revised Code, is not unconstitutional, counsel's many citations having no application here.

4. The attack on the practice of giving blood transfusions was not supported by any evidence—only some medical refer-

ences. The practice is so nearly universal and upheld by such an overwhelming array of medical scientists as to appear beyond lay attack. This point is not in issue.

5. The Biblical passages relied on to require vacation of the Court's emergency order were as follows:

| | |
|---|---|
| Genesis | 9:3, 4 |
| Leviticus | 3:17; 17:14 |
| Deuteronomy | 12:23 |
| Acts | 15:28, 29 |

To a layman unversed in the seemingly esoteric art of theological interpretation of the 17th century English version of ancient Hebrew and Greek Scriptures, these passages are, to say the least, somewhat obscure. They have to do with blood and the eating or taking thereof. Blood transfusion as administered by modern medicine was unknown to the authors of these cryptic dicta. Had its beneficient effects been know to them, it is not unlikely some exception would have been made in its favor—especially by St. Luke who is said to have been a physician.

But in our humble civil court we must confine ourselves to the civil law of the State. Religious doctrines and dogmas, be they obviously sound or curiously dubious, may not control. The parents in this case have a perfect right to worship as they please and believe what they please. They enjoy complete freedom of religion. The parents also have the right to use all lawful means to vindicate this right (and in the present instance they appear to have done their full duty by their religion).

But this right of theirs ends where somebody else's right begins. Their child is a human being in his own right, with a soul and body of his own. He has rights of his own—the right to live and to grow up without disfigurement.

The child is a citizen of the State. While he "belongs" to his parents, he belongs also to his State. Their rights in him entail many duties. Likewise the fact the child belongs to the State imposes upon the State many duties. Chief among them is the duty to protect his right to live and to grow up with a sound mind in a sound body, and to brook no interference with that right by any person or organization.

When a religious doctrine espoused by the parents threatens to defeat or curtail such a right of their child, the

State's duty to step in and preserve the child's right is immediately operative.

To put it another way, when a child's right to live and his parents' religious belief collide, the former is paramount, and the religious doctrine must give way.

The motion to vacate is overruled; the subsisting order may stand until further order. Appeal bond is fixed at $250.00. Exceptions to movants.

A journal entry may be prepared accordingly.