128 N.J. Super. 498 (1974)
320 A.2d 518
MUHLENBERG HOSPITAL, PLAINTIFF,
v.
GERALDINE PATTERSON, DONALD PATTERSON, AND BABY BOY PATTERSON A/K/A ANTHONY LENARD PATTERSON, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided January 22, 1974.
Mr. Norman Carter appeared on behalf of plaintiff Mrs. Geraldine Patterson and Mr. Donald Patterson, pro se.
*499 DREIER, J.D.C., Temporarily Assigned.
This matter involved an emergent application for the appointment of a Guardian Ad Litem and for an order permitting the staff physicians of Muhlenberg Hospital to effect a blood transfusion on the person of Anthony Lenard Patterson, a six day old infant. Anthony's parents are devout Jehovah's Witnesses and refused to permit such transfusion on religious grounds.
Anthony was born prematurely after 32 weeks gestation, and was found by his physician Dr. Rudolph Archer to be suffering from jaundice caused by an uncommon incompatibilty between Mrs. Patterson's blood and the child's system. Dr. Archer, understanding the parents religious aversion to blood transfusions, permitted the child's bilirubin count to exceed the level at which, ordinarily, he would have ordered such transfusion; but as the level approached one which could produce serious hazards to the child, Dr. Archer contacted the Chief of Pediatrics and the Hospital Administrator, who in turn requested assistance from the Court. I convened a hearing at Muhlenberg Hospital at 5:30 P.M. on January 22, 1974 at which were present the parents, two fellow Jehovah's witnesses (ministers), two friends of the parents, as well as the hospital director, other hospital personnel and Dr. Archer. Testimony was taken stenographically by a Court Reporter.
Dr. Archer testified that a bilirubin count of 20 or 21 would, within a short period of time, produce severe and irreparable brain damage, seriously impairing the infant's mental facilities, and that the count had risen during the day to the area of 18-19. Based upon my preliminary interrogation of the parents, I determined that the Guardian Ad Litem should be appointed, and Mr. Dailey, the Director of Muhlenberg Hospital, was so designated. He testified that from the hospital records and from consultations with the Chief of Pediatrics, it was necessary for the hospital to have permission to transfuse the infant and accomplish a complete blood exchange in the event the bilirubin content advanced *500 beyond its present state. Both he and Dr. Archer agreed that the danger was not one of loss of life, unless secondary infection set in following the adverse consequences of the liver problem. I found as a fact that, although there was only incidental danger to life, there was, to a reasonable medical certainty, immediate danger of irreparable brain damage and concomitant severe mental retardation, in the event the transfusion would be withheld when the bilirubin count equalled or exceeded 20. The requested order was signed after the hearing. Although the transfusion was attempted, the child later died from deterioration of his general physical condition. Notwithstanding the death, the legal question raised justifies the reduction to writing of the reasons for my decision. State v. Perricone, 37 N.J. 463, 469 (1962).
The parents and ministers and friends argued that the transfusion was against God's law (see the references in State v. Perricone, supra., 37 N.J. at p. 471), and, in addition, had never been authorized by any New Jersey Court in a case where there was not immediate danger to life.
I noted at the hearing, that transfusions have been directed in John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576 (1971); State v. Perricone, supra., and Raleigh FitkinPaul Morgan Memorial Hospital v. Anderson, 42 N.J. 421 (1964), certiorari denied 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964), but this case appears to be the first New Jersey case in which a blood transfusion has been ordered where the potential harm is serious injury, rather than death. The Perricone Court noted in passing that other States have ordered transfusions to save an infant's "life or mental health". 37 N.J., at p. 477.
In New Jersey, government action has been permitted in areas which would transgress religious beliefs where the general health of the community, rather than the saving of life, has been the beneficial goal. See Mountain Lakes Board of Education v. Maas, 56 N.J. Super. 245 (App. Div. 1959), affirmed 31 N.J. 537 (1960), certiorari denied 363 U.S. 843, 80 S.Ct. 1613, 4 L.Ed.2d 1727 (1960), involving the *501 vaccination of children, and Young v. Board of Health of Somerville, 61 N.J. 76 (1972), involving fluoridation of the public water supply. In these instances, however, the action taken has affected the community rather than the individual. The parents questioned the Court's power to require particular medical treatment which, although it may be beneficial to the patient, it is not necessary to save the patient's life. They asked: "Where will this intrusion end?, and, "Is it not the forerunner of State control over an individual's life?"
Courts elsewhere in the country have considered this issue, and there is apparently a split of authority, although the majority view supports the action taken in this case. See In Re Sampson, 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (1972), affirming 37 A.D.2d 668, 323 N.Y.S.2d 523 (3rd Dept. 1971), affirming 65 Misc.2d 658, 317 N.Y.S.2d 641 (1970); Morrison v. State, 252 S.W.2d 97 (Mo. App. 1952); Mitchell v. Davis, 205 S.W.2d 812 (Tex. Civ. App. 1947); Application of President and Directors of Georgetown College, Inc., 118 U.S. App. D.C. 80, 331 F.2d 1000 (1964), rehearing en banc denied, 118 U.S. App. D.C. 90, 331 F.2d 1010 (1964), certiorari denied 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); and People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E. 2d 769 (1952), certiorari denied 344 U.S. 824, 73 S.Ct. 24, 97 L.Ed. 642 (1952). Cf. Jehovah's Witnesses in State of Washington v. King County Hospital, 278 F. Supp. 488 (W.D. Wash. 1967), affirmed 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968), rehearing denied 391 U.S. 961, 88 S.Ct. 1844, 20 L.Ed.2d 874 (1968) where a Washington statute empowering Superior Court judges to declare children dependent for the purpose of transfusions was upheld, and the Court declared that the right to practice religion does not include the liberty to expose children to ill health or death. But see, In Re Brooks' Estate, 32 Ill.2d 361, 205 N.E.2d 435 (1965) involving refusal of a transfusion by an adult, (cited and rejected in John F. Kennedy Memorial *502 Hospital v. Heston, supra.); In Matter of Seiferth, 309 N.Y. 80, 127 N.E.2d 820 (1955), involving a fourteen year old boy who would not give his cooperation, (apparently but not explicitly, severely limited or overruled in In Re Sampson, supra.); and In Re Green, 448 Pa. 338, 292 A.2d 387 (1972), apparently rejecting the power to order transfusions, unless the child's life is immediately impaired.
The reasoning of the majority view, especially the very recent New York opinion of In Re Sampson, outweighs the arguments advanced in support of the minority view. The Courts have been and will continue to be the guardian of the religious rights of the individuals to see that this power of the State is not exercised beyond the area where treatment is necessary for the sustaining of life or the prevention of grievous bodily injury.
The guiding principles are found in the Perricone case where the Court stated:
"Concededly, freedom of religion and the right of parents to the care and training of their children are to be accorded the highest possible respect in our basic scheme [citing cases] But `neither rights of religion nor rights of parenthood are beyond limitation.' [citing cases] * * * In Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879), the Supreme Court upheld a Mormon's conviction for bigamy against the defense of interference with religious freedom as guaranteed in the First Amendment. Chief Justice Waite there stated: `Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of a religious worship, would it be seriously contended that the civil government in which he lived could not interfere to prevent a sacrifice?' 98 U.S., at p. 166, 25 L.Ed., at p. 250." 37 N.J., at pp. 472-473.
In discussing Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), the Perricone Court cited with approval the statement that:
"`Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal *503 discretion when they can make that choice for themselves.'" 37 N.J. at pp. 473-474 quoting from 321 U.S. at p. 170, 64 S.Ct. at p. 444.
The Court noted, at 37 N.J., pp. 478-479, that not every refusal to consent to treatment for an infant constitutes evidence of either unfitness or neglect to provide for proper protection, and gave examples of refusals to permit corrective surgery for congenital deformities as having been held insufficient grounds for taking custody from parents. Also, if the disputed procedure involved a significant danger to the infant, the parents' wishes would be respected. In our case, however, it cannot be said that the danger to the infant was slight if the procedure were not followed, nor that the transfusion procedure constituted a serious risk to the infant. (The death was apparently unrelated to the transfusion). Both questions were explored in detail with Dr. Archer. It is to the best interests of our society as a whole that infants be protected in instances where there be an imminent danger of severe and irreparable brain damage, just as where there is the equivalent danger of death. As was noted in the Prince and Perricone cases, it does not follow that parents who wish to be martyrs for their religious beliefs have a right to impose such martyrdom upon their offspring before they reach their age of full and legal discretion.
For the foregoing reasons, I have signed the order permitting the transfusion with the understanding that these reasons would be given as soon as a formal opinion could be reduced to writing.