189 Cal.App.3d 996 (1987)
235 Cal. Rptr. 22
In re ERIC B., a Person Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
TED B. et al., Defendants and Appellants.
Docket No. A031383.
Court of Appeals of California, First District, Division Four.
February 25, 1987.
*999 COUNSEL
Steven R. Matulich, Bowie & Bruegmann, David J. Bowie and William J. Bruegmann for Defendants and Appellants.
Victor J. Westman, County Counsel, Lorraine M. Walsh, Diane A. Baker, Andrea W. Cassidy and Sharon L. Miller, Deputy County Counsels, for Plaintiff and Respondent.
OPINION
POCHE, J.
The novel issue presented is whether the juvenile court can order that a dependent minor undergo periodic medical monitoring to detect the possible recurrence of a life-threatening disease notwithstanding objections by the child's parents that such would violate their religious beliefs and constitutional rights.

BACKGROUND
The history and pertinent circumstances behind this appeal can be briefly summarized.
The minor, Eric B., was born on November 22, 1980. His parents are Christian Scientists. In September of 1983 the parents noticed a problem with one of Eric's eyes and took him to a physician. The initial diagnosis was glaucoma, but further testing disclosed that Eric had retinal blastoma; *1000 in simple terms, eye cancer. In November, at the express request and authorization of Eric's parents, his left eye was surgically removed. Tests conducted subsequent to the surgery raised the possibility that not all of the cancer had been extirpated. Chemotherapy and radiation were recommended. The parents refused: they preferred to continue Eric's regular visits with an accredited Christian Science practitioner, which had started before the operation.
In January of 1984 Eric was placed in protective custody. The Sacramento County Department of Social Services thereupon filed a petition pursuant to Welfare and Institutions Code section 300, subdivision (a)[1] to have Eric declared a dependent child in order that the treatment recommendations could be implemented. In January and February of that year the Juvenile Court of Sacramento County conducted a series of hearings at which it heard evidence regarding the extremely high statistical probability that, without medical treatment, the cancer would reappear and that Eric might possibly die. The juvenile court sustained the petition; adjudged Eric a dependent child; placed him in the custody of his parents; and in effect ordered the parents to facilitate Eric's treatment in accordance with a specified program of spinal taps, chemotherapy, and radiation "until further order."
The family moved to Contra Costa County once Eric's treatment regimen commenced at an Oakland hospital. Pursuant to section 375, jurisdiction over Eric was transferred to the Contra Costa Juvenile Court, which in August of 1984 continued his status as a dependent child. In December of that year the attending physician advised the Contra Costa County Social Services Department that Eric's court-ordered therapy program would terminate around March of 1985. The physician recommended that Eric enter a two-year "observation phase," which would involve the same types of "determinations" and procedures as the current therapy program but would be "done less frequently."[2] The social services caseworker adopted this *1001 recommendation in her supplemental report to the juvenile court for its periodic review hearing (see §§ 364, 366.2) scheduled for February of 1985. The caseworker also advised that "[w]ithout the intervention of the Court, the parents continue to state that they would terminate conventional medical treatment" and would instead "continu[e] with their Christian Science treatments."
The periodic review hearing was conducted by a referee. A reporter's transcript of the proceedings before the Sacramento County Juvenile Court was received in evidence. The referee heard testimony from the attending physician, Eric's father, and the caseworker. The testimony need not be recounted in detail because its essentials can be reduced to the following: the physician testified that none of the tests performed during Eric's therapy program had revealed the presence or recurrence of cancer. The physician nevertheless believed that Eric would be at risk of such unless the "observation phase" procedures were ordered. He recommended that Eric be "monitored for the first two years off chemotherapy." Eric's father explained why he and his wife opposed continuing conventional medical remedies: "The basis is that we are Christian Scientists. Eric is having Christian Science treatment, and we believe that he should have only Christian Science treatment." The caseworker testified in effect that she had adopted the physician's recommendation in her supplemental report to the court because this was invariable practice of the social services department.
On February 27, 1985, the referee made an order continuing Eric's dependent child status; directed that Eric's physicial care and custody remain with his parents; and that "the parents follow the treatment and medical procedures recommended by the attending physician." As authorized by section 252, the parents moved for reconsideration of the referee's order by the juvenile court. The motion was denied, following which the parents commenced this timely appeal.[3]

REVIEW

I
(1) The parents first contend that the juvenile court lacked jurisdiction to continue Eric's dependency status. They reason that jurisdiction could be established pursuant to section 300 upon a showing that Eric needed medical *1002 treatment; but that once the need for immediate treatment disappeared, jurisdiction could not be continued according to section 364.[4] Much of this contention as argued by the parents pertains to the sufficiency of the evidence to support the continuation of the dependency, and so will be dealt with in part II, post. The remainder of the contention amounts to a claim that dependency jurisdiction can be neither initiated nor continued in the absence of a clear and present need for treatment.
The parents have not identified any California decision addressing this precise question. Independent research has discovered nothing on point from this state. There is California authority on an analogous subject which, together with a substantial body of decisions from other jurisdictions on the substance of the parents' contention, are sufficient to defeat the parents' claim.
In In re David B. (1979) 91 Cal. App.3d 184 [154 Cal. Rptr. 63], the issue before the court was whether a mother's parental rights had been properly terminated pursuant to Civil Code section 232 upon a showing of her history of violent behavior toward neighbors and pets. There was no evidence that she had ever displayed violence toward her son. The mother contended that there could not be "a severing of the parental relationship without a showing of actual neglect or mistreatment of the child." Based in part on the rejection of the same contention in In re William L. (1978) 477 Pa. 322 [383 A.2d 1228], cert. den. 439 U.S. 880 [58 L.Ed.2d 192, 99 S.Ct. 216], the court concluded that parental rights could be terminated in the absence of evidence that a parent's custody entails actual harm to a child. (91 Cal. App.3d 184 at pp. 192-196.) This holding was recently reiterated in In re R.S. (1985) 167 Cal. App.3d 946, 963-965 [213 Cal. Rptr. 690].
It is indisputable that there can be no greater intrusion by the state into the parent-child relationship than bringing it to an absolute end. Yet this has been done without proof of overt harm to the child. Substantial likelihood is sufficient. Given the qualitatively superior nature of the parental interest and the irreversible nature of the state's action in a termination proceeding, there is no reason why the state must make a greater showing in a dependency proceeding in order to effect a decisively less drastic disruption of parental autonomy.
*1003 The parents' contention would logically exclude legitimacy to state action which is intended to prevent harm. The idea that state authority can be mobilized only after the fact is untenable. Power is not disabled from dealing with latent risk. The state, having substantial interests in preventing the consequences caused by a perceived danger is not helpless to act until that danger has matured into certainty. Reasonable apprehension stands as an accepted basis for the exercise of state power. This is evident from decisions licensing state action to forestall potential or contingent harm. (See Wisconsin v. Yoder (1972) 406 U.S. 205, 233-234 [32 L.Ed.2d 15, 35, 92 S.Ct. 1526] [state may act "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens"]; accord Kate' School v. Department of Health (1979) 94 Cal. App.3d 606, 620 [156 Cal. Rptr. 529]; In re Roger S. (1977) 19 Cal.3d 921, 935 [141 Cal. Rptr. 298, 569 P.2d 1286] [speaking of "the state's interest in limiting parental control when parental action may harm the physical or mental health of the child"]; In re Phillip B. (1979) 92 Cal. App.3d 796, 802 [156 Cal. Rptr. 48], cert. den., sub nom.; Bothman v. Warren B. (1980) 445 U.S. 949 [63 L.Ed.2d 784, 100 S.Ct. 1597] ["The state should examine the seriousness of the harm the child is suffering or the substantial likelihood that he will suffer serious harm"]; see also Comment, Court-Ordered Medical Treatment for Minors: An Alternative Approach to Protect the Child's Best Interests (1985) 7 Whittier L.Rev. 827,831.) Numerous courts throughout the nation have reached the identical conclusion in situations more directly comparable to the circumstances of this case.
In Mannis v. State (1966) 240 Ark. 42 [398 S.W.2d 206], the issue was whether vaccination of a child could be ordered so that he might attend a private school. The Supreme Court of Arkansas held that a lower court's order for the vaccination was proper despite religious objections by the child's parents. In In re Rotkowitz (1941) 175 Misc. 948 [25 N.Y.S.2d 624], and Matter of Jensen (1981) 54 Ore.App. 1 [633 P.2d 1302], the courts ordered that an operation be performed to correct a physical deformity, notwithstanding parental objection and the lack of immediate medical necessity. In In re Karwath (Iowa 1972) 199 N.W.2d 147, the Supreme Court of Iowa upheld a lower court order that the adenoids and tonsils be removed from children over a parent's religious objections. The court specifically rejected the parent's argument that "a showing of medical crisis demonstrating an immediate threat to life and limb is essential" before the state could act. (Id. at pp. 149-150.)
An even more decisive line of authority deals with situations where, over parents' religious objections, courts have acted to prevent possible harm to unborn infants by ordering blood transfusions for the mother (Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson (1964) 42 N.J. 421 [201 A.2d *1004 537], cert. den., 377 U.S. 985 [12 L.Ed.2d 1032, 84 S.Ct. 1894]; see Jefferson v. Griffin Spalding County Hospital (1981) 247 Ga. 86 [274 S.E.2d 457] [transfusion and caesarean section authorized if needed]) or for the child once it is born. (Hoener v. Bertinato (1961) 67 N.J. Super. 517 [171 A.2d 140].)[5] In each of these cases there was no evidence that any actual harm was being inflicted on the unborn child. Yet in each instance, and over parental objection, the state acted to prevent the possibility of harm.
The unusual circumstances of this case lend a plausibility to the parents' claim that might otherwise be lacking. Granted, there was no clear and present showing of cancer in Eric. But no reason in either law or logic exists to demonstrate why the state, with the substantial interests it is entitled to assert on its own behalf as well as for a child, should be compelled to hold its protective power in abeyance until harm to a minor child is not only threatened but actual. The purpose of dependency proceedings is to prevent risk, not ignore it. We therefore reject the parents' contention that, as a matter of law, the juvenile court lacked jurisdiction to continue Eric's dependency. (See State v. Perricone, supra, 37 N.J. 463 at pp. 474-478 [181 A.2d 751, 757-759], where a substantially similar contention was rejected.) As previously mentioned, the parents' claim includes an evidentiary element. This aspect we consider next.

II
(2) The parents contend that no substantial evidence supports the referee's finding that Eric's best interests required continuation of the dependency.
The referee's finding is to be reviewed according to familiar rules. We have only to determine whether the finding is supported by substantial evidence, whether contradicted or undisputed. Any conflicts in the evidence are to be *1005 resolved in favor of the finding. All reasonable inferences are likewise indulged to uphold the finding. (In re Robert D. (1984) 151 Cal. App.3d 391, 396 [198 Cal. Rptr. 801]; Guardianship of Phillip B. (1983) 139 Cal. App.3d 407, 413-414 [188 Cal. Rptr. 781]; In re Phillip B., supra, 92 Cal. App.3d 796 at p. 802; In re David B., supra, 91 Cal. App.3d 184 at p. 197.)
(3) This is not all. "Several relevant factors must be taken into consideration before a state insists upon medical treatment rejected by the parents. The state should examine the seriousness of the harm the child is suffering or the substantial likelihood that he will suffer serious harm; the evaluation for the treatment by the medical profession; the risks involved in medically treating the child; and the expressed preferences of the child. Of course, the underlying consideration is the child's welfare and whether his best interests will be served by the medical treatment." (In re Phillip B., supra, 92 Cal. App.3d 796 at p. 802.) (4) Finally, we recognize that the juvenile court is vested with a "very extensive discretion in determining what will be in the best interests of a child," and that its determination will not be reversed save for clear abuse of that discretion. (In re Robert D., supra, 151 Cal. App.3d 391 at p. 396.)
(5) The only qualified medical testimony came from Eric's attending physician. He was asked "what would be your prognosis for Eric if he was not monitored?" He responded: "[W]e feel there is about a 25 percent chance he might have a recurrence and about a five to ten percent chance he might have a second tumor.... So ... [t]here is maybe a 40 percent chance he would die if there's nothing monitored and nothing done about it." Eric's father testified that, unless ordered by the court, he would not have Eric monitored but would instead rely exclusively on "only Christian Science treatment."[6]
It is undisputed that Eric has already had one bout with cancer. The testimony of the attending physician supports the conclusion that Eric faced a not insignificant danger of future risk from a recurrence of this life-threatening disease. The testimony of Eric's father supports the reasonable inference that, if this danger actualized while Eric was not being monitored but was receiving "only Christian Science treatment," the disease *1006 would go undetected. Together, this constitutes substantial evidence supporting the referee's finding that Eric's best interests would not be served by exposing him to this possible peril.
The finding also comports with the factors identified in In re Phillip B. Eric faced an appreciable risk of harm from a deadly disease. Medical opinion testimony was uncontradicted on this point. The risks entailed by the monitoring are minimal, although a certain amount of physical discomfort might be expected. The parents concede that Eric is too young to express his own preference regarding Christian Science or conventional medical treatment.
Our conclusions are that the referee's finding is supported by substantial evidence (In re Phillip B., supra, 92 Cal. App.3d 796 at p. 802; In re David B., supra, 91 Cal. App.3d 184 at p. 197) and that it cannot be characterized as an abuse of his "very extensive discretion in determining what will be in the best interests of a child." (In re Robert D., supra, 151 Cal. App.3d 391 at p. 396.)

III
(6) One argument which the parents have asserted at all stages of the dependency proceedings is that California recognizes "the validity of treatment by spiritual means alone." The centerpiece of their position is section 300.5, which provides: "In any case in which a minor is alleged to come within the provisions of Section 300 on the basis that he or she is in need of medical care, the court, in making such finding, shall give consideration to any treatment being provided to the minor by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination by an accredited practitioner thereof." Numerous statutes scattered throughout various codes also deal with this subject.[7]
*1007 The purpose of section 300.5 appears to be rather limited. It simply identifies one factor to be considered by the juvenile court. It is declaratory with respect to one component  where applicable  of the judicial decision-making process. The statute is content neutral and not substantive: unlike related provisions (see fn. 7, ante), section 300.5 does not specify what conclusion(s) shall be drawn from the fact that a minor is receiving "treatment ... by spiritual means" instead of conventional medical treatment.[8] It clearly does not preclude the court, exercising its "very extensive discretion in determining what will be in the best interests of a child" (In re Robert D., supra, 151 Cal. App.3d 391 at p. 396), from concluding that spiritual treatment alone is not sufficient to arrest a danger which otherwise requires that a dependency be declared in order that the minor can receive conventional medical treatment deemed more likely to succeed.
(7) This is more or less what the referee did. In announcing his decision the referee expressly stated "I do consider 300.5," but because it was "not enough ... that prayer treatment ... should be the only course of treatment,"[9] he concluded that Eric's best interests would be served by continuing the dependency in order that he could be monitored. We hold that the referee gave proper effect to section 300.5, which was not an impediment to continuing the dependency.

*1008 IV
(8) The parents contend that the referee denied them due process of law in several aspects of the process by which his decision was reached. They are in effect asserting that they were denied their constitutional right to an impartial tribunal. (See Schweiker v. McClure (1982) 456 U.S. 188, 195 [72 L.Ed.2d 1, 7-8, 102 S.Ct. 1665]; Marshall v. Jerrico, Inc. (1980) 446 U.S. 238, 242-243 [64 L.Ed.2d 182, 188, 100 S.Ct. 1610]; Lois R. v. Superior Court (1971) 19 Cal. App.3d 895 [97 Cal. Rptr. 158].)
They first attack the referee's statement that he would not allow Eric to be treated exclusively by spiritual means absent a showing that it would be 100 percent effective. This they construe to mean that the referee refused to follow section 300.5. The discussion in part III, ante, suffices to rebut this argument.
The parents' next claim that the referee "misunderstood" the evidence presented. They protest the referee's statements that: (1) the Christian Science practitioner who was treating Eric (and who testified at the Sacramento proceeding) claimed an 80-85 percent likelihood of a cure from Christian Science treatment; and (2) the parents delayed in getting treatment for Eric once his affliction was discovered. The parents' first objection is correct: the practitioner made no such claim. The referee's second comment appears to have been based upon a medical report which is not a part of the record on appeal and which in any event was made in reference to the initial dependency finding by the Sacramento Juvenile Court. Both comments are of minimal significance and thus would not justify reversal by any standard of prejudice. (Cal. Const., art. VI, § 13; Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)
Finally, the parents claim that the referee misconstrued the quantum of risk necessary for continuance of the dependency. This point was considered and rejected in parts II and III, ante. In this connection we note Justice Cardozo's celebrated statement equating due process with "the very essence of a scheme of ordered liberty" (Palko v. Connecticut (1937) 302 U.S. 319, 325 [82 L.Ed. 288, 292, 58 S.Ct. 149]), which is commonly cited as one formulation of what is encompassed by the concept of due process. (See, e.g., Roe v. Wade (1973) 410 U.S. 113, 152-153 [35 L.Ed.2d 147, 176-177, 93 S.Ct. 705]; Nash v. City of Santa Monica (1984) 37 Cal.3d 97, 116 [207 Cal. Rptr. 285, 688 P.2d 894], app. dism. (1985) 470 U.S. 1046 [84 L.Ed.2d 807, 105 S.Ct. 1740].) The United States Supreme Court stated that in this type of clash between parents and the state "the very concept of ordered liberty precludes allowing every person to make his own standards on *1009 matters of conduct in which society as a whole has important interests." (Wisconsin v. Yoder, supra, 406 U.S. 205 at pp. 215-216 [32 L.Ed.2d 15, at p. 25].)

V
The parties have raised various other contentions, all of which are ancillary to the issues already examined. We do not reach these additional arguments because they would not alter our conclusion that there exists no basis for overturning the order of the referee.
The order is affirmed.
Anderson, P.J., and Channell, J., concurred.
A petition for a rehearing was denied March 18, 1987, and appellants' petition for review by the Supreme Court was denied May 14, 1987.
NOTES
[1] This statute currently provides in pertinent part: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] (a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent, guardian or custodian actually exercising care or control."

Statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] The physician explained his recommendation for Eric as follows: "Assuming he gets to the off therapy point, free of obvious clinical recurrence, we would perform a bone scan, a CT scan of the brain, a spinal tap and bone marrow aspirate to rule out any evidence of residual disease. At that point he would come off therapy and enter an observation phase. This would consist of examinations by us approximately every six weeks, a CT scan of the affected area every four months the first year off therapy, with bone scan every six months. In the second year off therapy these determinations would be done less frequently.... [S]hould a recurrence occur, this would need to be biopsied and an attempt at a full resection made. Our recommendations for further therapy at that time would depend on the microscopic examination of the tissue since these children are at risk for developing further tumors."
[3] The parents state in their notice of appeal that they appeal from the referee's order and from the juvenile court's order denying their motion for reconsideration. In their briefs, however, they raise no argument regarding the juvenile court's order. We therefore treat the appeal as being from the referee's order only. (See In re William C. (1977) 70 Cal. App.3d 570, 573-577 [138 Cal. Rptr. 843].)
[4] Section 364, which governs the dependency review hearings to be conducted at intervals not to exceed six months, specifies in subdivision (c): "After hearing any evidence presented by the probation officer, the parent or the minor, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the probation department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, ..."
[5] Courts throughout the country have also ordered transfusions for minors over parental objection if deemed by responsible medical opinion to be necessary to prevent immediate or potential harm. (See, e.g., People ex rel. Wallace v. Labrenz (1952) 411 Ill. 618 [104 N.E.2d 769, 30 A.L.R.2d 1132], cert. den., 344 U.S. 824 [97 L.Ed.2d 642, 73 S.Ct. 24]; Morrison v. State (Mo. App. 1952) 252 S.W.2d 97; State v. Perricone (1962) 37 N.J. 463 [181 A.2d 751], cert. den., 371 U.S. 890 [9 L.Ed.2d 124, 83 S.Ct. 189]; Muhlenburg Hospital v. Patterson (1974) 128 N.J. Super. 498 [320 A.2d 518]; Matter of Santos (1962) 16 App.Div.2d 755 [227 N.Y.S.2d 450]; In re Clark (1962) 21 Ohio Ops.2d 86 [185 N.E.2d 128], see also Jehovah's Witnesses of Washington v. King County Hosp. (W.D.Wash. 1967) 278 F. Supp. 488, affd. per curiam (1968) 390 U.S. 598 [20 L.Ed.2d 158, 88 S.Ct. 1260].) Transfusions and operations have in some instances not been ordered if contrary to the wishes of a minor deemed mature enough to decide for himself. (See In re Seiferth (1955) 309 N.Y. 80 [127 N.E.2d 820]; In re Green (1972) 448 Pa. 338 [292 A.2d 387, 52 A.L.R.3d 1106]; cf. In re Sampson (Fam.Ct. 1970) 65 Misc.2d 658 [317 N.Y.S.2d 641], affd. per 29 N.Y.2d 900 [328 N.Y.S.2d 686, 278 N.E.2d 918]; In re Hudson (1942) 13 Wn.2d 673 [126 P.2d 765].)
[6] The father gave these answers in response to questioning by his attorney: "Q.... At the termination of ... the treatment of your child, given your choice would you be taking the child back for monitoring? [¶] A. No, I would not. [¶] Q. Okay.... Is there a reason  a basis upon which you would decline to have the medical people monitor? [¶] A. Yes there certainly is. [¶] Q. And what is that? [¶] A. The basis is that we are Christian Scientists. Eric is having Christian Science treatment, and we believe that he should have only Christian Science treatment. [¶] ... Q. And you would continue to treat Eric through Christian Science treatment subsequent to his release to [sic: from] the dependency status of this court? [¶] A. Absolutely." (Italics added.)
[7] Among the more pertinent, insofar as they are related to section 300.5, are the following:

Section 16509.1 provides: "No child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall, for that reason alone be considered to have been neglected within the purview of this chapter." ("State Protective Services for Children," commencing with § 16500.)
Section 18950.5 provides in pertinent part: "For the purposes of this chapter [`Office of Child Abuse Prevention,' commencing with § 18950], a child receiving treatment by spiritual means as provided in Section 16508 [now: § 16509.1] ... shall not for that reason alone be considered an abused or neglected child."
Penal Code section 270 specifies criminal penalties for a parent of a minor child who "willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter or medical attendance, or other remedial care for his or her child." It further provides: "If a parent provides a minor with treatment by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination, by a duly accredited practitioner thereof, such treatment shall constitute `other remedial care', as used in this section."
Penal Code section 11165, subdivision (c)(2) provides in pertinent part: "For the purposes of this chapter [`Control of Criminals,' commencing with § 11150, particularly article 2.5, `Child Abuse Reporting,' commencing with § 11165], a child receiving treatment by spiritual means as provided in Section 16509.1 of the Welfare and Institutions Code or not receiving specified medical treatment for religious reasons, shall not for that reason alone be considered a neglected child. An informed and appropriate medical decision made by parent or guardian after consultation with a physician or physicians who have examined the minor shall not constitute neglect."
[8] The parents' reliance on People in the Interest of D.L.E. (1980) 200 Colo. 244 [614 P.2d 873], is clearly misplaced. The court there held that a surgical operation to correct a condition which was not life-threatening could not be ordered over the minor's parents' religious objections because of a statute which embodied a substantive directive akin to those in sections 16509.1, 18950.5, and Penal Code section 11165, subdivision (c)(2). (Id. at p. 874.)

We note parenthetically that when the minor's condition later became a threat to his life an order for the operation was upheld notwithstanding the statute. (People in Interest of D.L.E. (Colo. 1982) 645 P.2d 271.) The same was the case in State v. Perricone, supra, 37 N.J. 463 [181 A.2d 751] and Matter of Jensen, supra, 633 P.2d 1302.
[9] The Sacramento Juvenile Court, the attending physician, and the referee all commented that the parents' religious beliefs are held with the utmost sincerity and conviction. It has never been suggested that they are anything other than exemplary parents.