552 A.2d 1114

In the Matter of Tara CABRERA, a Minor.

**Appeal of Frank and Virginia INGRAM.**

**In the Matter of Tara CABRERA, a Minor.**

**Appeal of Tara Cabrera.**

Superior Court of Pennsylvania.

Submitted Aug. 15, 1988.
Filed Jan. 13, 1989.

Stuart J. Schatz, Norristown, for appellants (at 1799).

Kenneth L. Klothen, Philadelphia, for appellant (at 2006).

Before TAMILIA, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge:

This case involves cross-appeals from the order (later reduced to judgment) entered in this matter on the 6th day of June, 1988, adjudicating Tara Cabrera dependent and appointing a guardian *ad litem* to consent to her blood-transfusion-therapy for a period of one year. We affirm.

The facts, unlike the legal conclusions to be drawn therefrom, are not in dispute and reveal that Frank and Virginia Ingram, on the 18th day of February, 1988, transported their six-year-old daughter Tara to Children's Hospital of Philadelphia for diagnosis and treatment for her fever, limp and pain in her hip.

Dr. Kwaku Ohene–Frempong, the Director of the Sickle Cell Program and Hematology at Children's Hospital of

Philadelphia, was the attending physician for incoming patients diagnosed as having sickle-cell anemia.[1] After a series of neurological and orthopedic tests, a CAT scan revealed evidence of "an old stroke" in Tara's brain. Her symptoms were diagnosed as the recurrence of her initial stroke.

In order to calculate the extent of damage sustained by Tara, Dr. Frempong recommended a blood transfusion to reduce the number of sickle-cells in her system. This would avail the doctor the opportunity to gauge more accurately the damage caused by the stroke(s), and, thus, prescribe a course of treatment.

The Ingrams refused, on both medical and religious grounds, to give consent to the transfusions. As a result, Children's Hospital of Philadelphia filed a petition with Common Pleas Court seeking its appointment as special guardian to Tara to consent to a series of blood transfusions.

A hearing was held on March 2, 1988, in which Doctor Frempong testified that Tara's condition was consistent with other children with sickle-cell anemia who have had strokes and are not transfused, i.e., 70% of them will have a recurrent stroke and 80% of those recurrences will take place within the first three years after the initial stroke. As a consequence thereof, Doctor Frempong noted the likelihood of increased risk of crippling and mental retardation. As for the risk of death in such cases, he stated: "The risk of death is smaller in children and much higher" in adults. The "only" treatment presently available for the illness, as observed by Doctor Frempong, was blood transfusions, which, it was stated, would prevent strokes from recurring in 90% of the cases.

---

**1.** Sickle-cell anemia, predominantly found in Blacks, is a genetically determined anemia characterized by the presence of hemoglobin S in red blood cells. Dorland's Illustrated Medical Dictionary 72 (26th ed. 1981).

Albeit there are inherent risks in administering transfusions,[2] Doctor Frempong believed it "may be the best of two evils" in the treatment of sickle-cell patients. Once the tests were conducted, the doctor would have a better idea of the damage to the blood vessels in the brain, and what risks would be involved if transfusions were not ordered.

Mrs. Ingram appeared at the hearing and voiced her objections to the transfusions. Her religious ground was linked to her being a Jehovah's Witness, a tenet which does not subscribe to the use of blood in any form on the individual. As for her medical objections, she pointed to the fact that Doctor Frempong would not assure ("guarantee") her that Tara would not die immediately after the transfusions. Since she perceived her daughter to be in good health, she saw no need for the transfusions.

The court disagreed with Mrs. Ingram and permitted Children's Hospital of Philadelphia to conduct the transfusions to assess Tara's brain damage, if any. Then, once this was completed, it could be determined whether transfusions would be in order for four years or more to minimize a recurrence of another stroke.

At the follow-up hearing held on April 5, 1988, Doctor Frempong testified that the results of Tara's arteriogram indicated that she had blood vessel damage to the right and left sides of her brain. This type of damage was consistent with "sickle cell children who have had strokes." As for Tara, who clearly showed signs of "major" vessel disease, Doctor Frempong opined that the probability of recurrence of a stroke would be in the 70–80 percentile range. In

---

**2.** *Doctor Frempong testified to the following risks attendant to any* transfusion:

1.) The contraction of the AIDS virus. The statistical probability of doing so is one in forty thousand.

2.) The contraction of infectious hepatitis. The statistical probability of doing so is one in two thousand.

3.) The body may reject the transfusion.

4.) Iron overload may occur in the body; over a period of 15 to 20 years of transfusions, the body stores an excessive amount of iron which may endanger one's liver and heart. However, this is treatable.

regard to the risks associated with the treatment to Tara in this case, the doctor stated:

We know for a fact this child has a very high risk for recurrent strokes and that with recurrence of strokes there is more brain damage, more potential for crippling brain damage and also mental retardation.... [A]gainst all the risks, we still feel this is the best treatment available for children with sickle-cell disease who have had strokes. It is by no means the best one would have hoped for, but *it is the only treatment available.* (Emphasis added)

Before the court made its decision on whether to order additional transfusions, the parents of Tara were afforded the chance to secure opinions from other doctors as to alternative forms of treatment for this child. As a result thereof, a hearing was held on the 29th day of April, 1988, wherein Mrs. Ingram presented evidence from two doctors supposedly supportive of her contention that blood transfusions, and their inherent risks, were not the only means by which to minister to Tara's condition.

The first physician was a Doctor Pourfar, a hematologist residing in New York City. Mrs. Ingram and Tara visited him, and he examined the patient and her hospital records. He recommended, in his two-page hand-written letter, that transfusions should be implemented only if Tara's hemoglobin (Hb) level dropped below 7.5 grams. He noted that folic acid and aspirin should be continued to be administered to the patient.

The second doctor, one William H. Pogue, was a hematologist from New Britain, Connecticut, and he prepared a two-page typed report in which he made reference to alternative methods of treating Tara, e.g., antiplatelet agents (coumadin, aspirin and sulfinpyrazone). However, he conceded in his report that he could "find no evidence in the medical literature of any systematic study of alternative therapy." In essence, it would appear that Doctor Pogue was espousing in his report the use of antiplatelet agents as an alternative therapeutic choice to blood transfusion thera-

py. Even though none had been tested, he believed the risk involved was no more acute than the present therapy with blood transfusion, the efficacy of which no one could "guarantee" in preventing another stroke.

When Doctor Frempong took the stand, he commented that Doctor Pourfar's recommendation that Tara might need a transfusion only if her hemoglobin dropped below 7.5 was "utter nonsense."

Since the average blood count for most patients is between 6.0 and 9.0, at any one time, about 40% would have hemoglobin that low and still be healthy and without the need for any blood transfusion. Thus, remarked Doctor Frempong, Doctor Pourfar "is confused about the reason why we may be recommending transfusions for Tara."

As for Doctor Pogue's report, Doctor Frempong noted that some of the alternative therapies mentioned came from a study done at Children's Hospital of Philadelphia. There, two patients were mentioned as having taken aspirin and sulfinpyrazone, but these were two patients who could not be transfused for various reasons. This treatment, observed Doctor Frempong, has never been tested in any research study or in any published study, and nobody has ever reported that such treatment would prevent strokes in a sickle-cell patient. It was mentioned simply as a fact about two patients. It was not cited as an alternative therapy that anybody should try. More particular, the doctor stated, the dispensation of folic acid, aspirin and coumadin in a sickle-cell case was considered to be a "risky" therapy since these medications dealt with the thinning of blood and sickle-cell disease was not a blood-clotting problem.

Lastly, Doctor Frempong mentioned that if Tara did not receive the transfusion therapy, albeit she would not be in "imminent danger of death", the witness did think she was in "danger of recurrent strokes". The consequences of which would be that Tara would be exposing herself, in a percentage range of 70% to 80%, to:

(a) losing her current level of intellectual functioning;

(b) becoming "physically crippled";

(c) going blind, possibly; and

(d) losing her ability to speak.

In addition, the guardian *ad litem* was present and stated, after speaking with the people involved and members of the medical community (e.g., a Doctor Stuart and Doctor Frempong), the therapy described by Doctor Frempong for Tara was "the standard therapy which is recommended and ordered by experts in sickle-cell disease". He was in favor of having transfusions administered to Tara since the state of medical knowledge indicated no effective alternative, i.e., hypertransfusion therapy was the "only" way to protect Tara.

After consideration of the aforementioned evidence, the court below denied Children's Hospital of Philadelphia its petition seeking appointment as a special guardian for Tara. However, with the filing of exceptions to the order of court, a request for another hearing to present additional medical testimony was granted.

On May 25, 1988, a hearing was conducted in which Doctor Marie Jean Stuart, Chief of Hematology at Saint Christopher's Hospital, testified that there was a 16%–18% chance that Tara would die within one week to one year following her last stroke if transfusion therapy was not commenced. She also believed that Tara had an 80% probability of having a recurrent stroke because of her having suffered two prior strokes without transfusion. Further, Tara was considered to be a candidate to suffer severe neurological deficiencies or other complications relating to stroke, i.e., death.

Doctor Stuart concurred in Doctor Frempong's transfusion therapy as being the best medical treatment available. Likewise, she discounted the feasibility of alternative therapies, as was discussed in Doctor Pogue's report, since none had been tested positive against sickle-cell anemia. More importantly, she characterized Tara's condition as a "semi-emergency", which she considered to be a situation where a

person faces death within a week to a year after diagnosis of an ailment.

The end result of the hearing was the entry of the June 6, 1988, order appointing Saint Christopher's Hospital as special guardian for the purpose of consenting to blood transfusion therapy for Tara for a period of one year only. This appeal followed.[3]

The first issue we shall address, which appears at appeal No. 1799 Philadelphia 1988, concerns the Ingrams' contention that the Commonwealth should not be able to compel their daughter Tara to undergo blood transfusions, given their religious objections as Jehovah's Witnesses, in the absence of evidence that Tara's life is in "immediate peril".

In responding to the claim made, we begin with the fundamental premise that an individual's right to hold and to practice his/her religious beliefs free from governmental interference is guaranteed by the First Amendment to the United States Constitution, its counterpart in this Commonwealth being Article 1, Section 3 of the Pennsylvania Constitution. See *Commonwealth v. Barnhart*, 345 Pa.Super. 10, 497 A.2d 616, 622 (1985).

The guarantee of freedom of religion is intended to secure the rights of the individual as against the state. Underlying the guarantee is a principle of neutrality, a belief that religion is "not within the cognizance of civil government." *Reynolds v. United States*, 98 U.S. 145, 163, 25 L.Ed. 244 (1878); *Barnhart*, supra. Nevertheless, the right of the parent to control every aspect of a child's life is not absolute. When actions concerning a child have a relation to that child's well-being, the state may act to promote these legitimate interests. *Bykofsky v. Borough of Middletown*, 401 F.Supp. 1242, 1262 (M.D.Pa.1975). The existence of such authority is evident in the remarks of the Court in *Prince v. Massachusetts*, 321 U.S. 158, 166–67, 64 S.Ct. 438, 442–43, 88 L.Ed. 645 (1944):

3. A request to have the order of court stayed pending appeal was denied.

... the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include the liberty to expose the community or the child to communicable disease or the latter to ill health or death. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction. (Citations omitted)

Accordingly, in cases where harm to the physical or mental health of the child is demonstrated, these legitimate state interests may override the parents' qualified right to control the upbringing of their children. See *Wisconsin v. Yoder,* 406 U.S. 205, 230, 92 S.Ct. 1526, 1540, 32 L.Ed.2d 15 (1972); *Application of President and Directors of Georgetown College, Inc.,* 118 U.S.App.D.C. 80, 331 F.2d 1000, 1007–1010, *cert. denied,* 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); *In re Eric B.,* 189 Cal.App.3d 996, 235 Cal.Rptr. 22 (1987); *In re Sampson,* 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (1972); *People ex rel. Wallace v. Labrenz,* 411 Ill. 618, 104 N.E.2d 769 (1952), *cert. denied,* 344 U.S. 824, 73 S.Ct. 24, 97 L.Ed. 642 (1952); *Muhlenberg Hospital v. Patterson,* 128 N.J.Super. 498, 320 A.2d 518 (1974); *Raleigh Fitkin–Paul Morgan Memorial Hospital v. Anderson,* 42 N.J. 421, 201 A.2d 537 (1964); *In re Clark,* 21 Ohio Op.2d 86, 185 N.E.2d 128 (1962).

The Ingrams cite *In re Green*, 448 Pa. 338, 292 A.2d 387 (1972), for the proposition that "[i]f there is no imminent danger to the child, then the State does not 'have an interest of sufficient magnitude to outweigh the parent's religious beliefs.'" (Brief at 5)

In *Green*, there was a situation where a state hospital filed a petition seeking to have one Ricky Green declared a "neglected child" under the then Juvenile Court Law (presently found at 42 Pa.C.S.A. § 6302 (1982)) and have it appointed as guardian.

It appears that Green, 17 years old at the time of the appellate ruling, suffered from paralytic scoliosis (94% curvature of the spine). This prevented him from standing or ambulating due to the collapse of his spine. To relieve the problem, doctors recommended "spinal fusion", a dangerous operation to which the mother consented conditionally. Being a Jehovah's Witness, she would allow the surgery but not any blood transfusion. This prompted the hospital to seek relief through the courts. Superior Court reversed the lower court's denial of the petition seeking Green adjudged "neglected" and the appointment of the hospital as guardian. On appeal, the Supreme Court reversed, remanding to allow the son the opportunity to voice his own position as to whether he wanted to have the operation, he being of age to make that decision without parental intervention. However, in the course of doing so, the Court wrote:

> ... as between a parent and the state, the state does not have an interest of sufficient magnitude outweighing a parent's religious beliefs when the child's life is *not immediately imperiled* by his physical condition.

448 Pa. at 348, 292 A.2d at 392 (Emphasis in original). This statement was the outgrowth of a case scenario in which, albeit the operation on Green would have been beneficial, there was no evidence that his life was in danger or that the operation had to be performed immediately. As a consequence, the Court was confronted with a situation in which a parent would not consent to a *dangerous* operation on a

minor child requiring blood transfusion *solely* because of her religious beliefs.[4]

■ We believe the case at bar to be distinguishable from *Green*. For example, granted Tara was not *in extremis* physically, and Doctor Frempong stated as much when he responded to the question of whether Tara was in grave or imminent danger of death without the transfusions in the following manner:

If she receives the current care available, I would not say that she's in imminent danger of death, but any child with sickle-cell disease faces a danger of death from certain complications.

The most difficult of these complications would be a stroke in a part of the brain that controls breathing, heartbeat, and functions like that, for which, at this time, we have no way of reversing.

The court below noted the absence of "certainty" by the doctors in saying, unequivocally, that death would ensue if transfusions were not commenced in Tara's case. Nonetheless, an argument could be made that Tara's sustaining a debilitating consequence from her failure to receive transfusion, on a sliding scale of available medical information, undoubtedly was extant. As stated by the court below:

... Tara's condition is a matter of life or death. Although the exigency of the situation cannot be precisely determined, Dr. Frempong and Dr. Stuart have both testified that although they cannot say that Tara, without the long-term therapy will die today or tomorrow, they can say that without the therapy there is an eighty (80) percent chance of a recurrent stroke, the complications of which can be fatal. Dr. Frempong has testified that there is always the chance of complete recovery after a stroke but Dr. Stuart is of the opinion that according to research, there is a significant incidence of residual effects which can be fatal. For instance, after a major

**4.** This fatal/non-fatal dichotomy has been characterized as the minority view in this country. See *Muhlenberg Hospital v. Patterson*, 128 N.J.Super. 498, 320 A.2d 518 (1974).

stroke a child could be left with an I.Q. of less than seventy (70) and be a mental cripple for the remainder of its life. Furthermore, without long-term treatment, Tara's life span will definitely be shortened and recurrent strokes will result in cumulative damage to her life functioning.

Furthermore, we have a situation *sub judice*, unlike in *Green*, where the procedure to be implemented is not categorized as "dangerous"[5] nor is the parent's objection to the transfusion premised solely on a religious ground—Mrs. Ingram's medical fears were "stronger" than her religious objections. As she phrased it:

... I'm seeking an alternative to blood transfusions, another way of treatment. * * * * I want any thing that will be able to help [Tara]. Any drug that they found that will be helpful, I will agree with it. * * * * If they can administer anything helpful, I wouldn't be against it at all. I would never be against it.

Even the guardian *ad litem* was able to detect the root of the parent's concerns, as evidenced from his testimony in court that Mrs. Ingram's "major" objection about what should be done for Tara was "her disagreement with the medical opinions of Doctor Frempong and Children's Hospital".

We read *Green* as not requiring that a patient be at death's door before medical intervention need be allowed to alleviate (or even minimize) the likelihood of a patient sustaining a debilitating or even fatal injury to her person as a result of abstaining from the only medically accepted measure of treating his or her ailment.

5. The risks associated with the transfusion therapy have already been set forth in footnote 2, along with the attendant probability of contracting any side-effects therefrom. We would only add that medical knowledge has advanced to the stage, save for AIDS, of being able to treat any complications which may arise from the transfusions. As for the screening of AIDS and hepatitis, all known precautions are taken, even though no one can "guarantee" that their contraction can be avoided. But, such is the case in any medical treatment/operation.

Granted, death is not an "immediately" impending consequence if Tara is not afforded transfusion. On the other hand, just as acute is a 70% probability that Tara will sustain a stroke,[6] which is an 80% probability of coming to pass within the first three years of an initial stroke. Such has occurred twice in Tara's case, so state the doctors. Any further strokes present the real problem of resultant mental retardation, loss of speech, severe paralysis (which includes hemiplegia or paraplegia, paralysis of one-half of the body), and loss of other intellectual functions on a selective basis without profound mental retardation is also possible.

The best statistics available, which, interestingly enough, are derived from Children's Hospital of Philadelphia, indicate that since 1984 (in 35 cases) "at least ninety percent of the patients had not had a major central nervous system stroke" who were transfused. (See Doctor Frempong's testimony at N.T. 4/29/88 at 55) Consistent therewith is evidence that since 1978, Children's Hospital of Philadelphia has had an average of 400 cases with sickle-cell disease. At any one time, there are 25 patients being treated for the illness by transfusion. None has suffered a recurrent "major" stroke. One or two patients have had T.I.A. (see note 6), which consists of numbness in different parts of the body that may last a few hours or just a few minutes. *Id.*

We hold that it is in the best interest of society as a whole that children be protected in situations where death may occur between one week and one year of the diagnosis and refusal of treatment, a statement made by Doctor Stuart in reference, specifically, to sickle-cell patients.

Medical evidence available does indicate to a 70% likelihood that a debilitating stroke will be suffered by a sicklecell anemia patient. We find that such a circumstance is not a departure from *Green*. Rather, we believe that the onset of a disease such as sickle-cell anemia, the residual effect of which will manifest itself in either severe mental

---

6. Stroke has been defined as a prolonged clinical change of either weakness or numbness. (N.T. 4/29/88 at 62–63) A transient ischemic attack (T.I.A.) is called just that because it is transient and is also referred to as a "minor" stroke. *Id.*

retardation, paralysis *or even death,* if not treated under the *only* procedure medically tested and approved as having a success rate of 90% is consistent with a "peril" justifying medical intervention under *Green.* See *In re Eric B.,* supra. As noted in *Prince,* supra, it does not follow that parents who wish to be martyrs for their religious beliefs have a right to impose such martyrdom upon their offspring before they reach their age of full and legal discretion. Compare *In Interest of E.G.,* 161 Ill.App.3d 765, 113 Ill.Dec. 477, 515 N.E.2d 286 (1987).

Having concluded that the medical treatment implemented (and on-going) in Tara's case was warranted to curb the likelihood (70% chance) of another stroke leading to mental infirmity or even death, in the extreme, we need not address the second prong of the Ingrams' protestation that the court below erred in adjudicating their child "neglected" under the Juvenile Act. Cf. *Green,* supra.

■ We do need to respond, however, to the allegation set forth in the cross-appeal of the guardian *ad litem* docketed at No. 2006 Philadelphia 1988. Therein, the guardian *ad litem* argues that the court below erred in affixing a one year period for the transfusion to be administered; thereafter it is subject to an update as to its feasibility and continued use given Tara's condition and the state of medical knowledge at the time. We agree with this *ad hoc* approach to a developing area of medicine.

As indicated by Doctor Frempong, a transfusion would have to occur every three or four weeks, given the rate at which the human body afflicted with sickle-cell anemia destroys healthy red blood cells. This process, "based on the best evidence" available, would have to be performed "at least four years, mostly likely, indefinitely".

Although, Doctor Frempong admitted that research is continuing in the attempt to uncover an alternative choice to transfusion, the doctor's recommendation of transfusions is based on the state of medicine at the moment, and that the length of treatment would probably be for the rest of Tara's life, unless the medical community came up with a

cure or some other method of treatment. This was also the view of the guardian *ad litem,* as espoused before the court below, i.e., there may be alternative therapy "out there some where, either known today or not known today, which would be as or more effective" than transfusions.

Because of the unpredictability of when a breakthrough in medical research may surface in the treatment of sickle-cell anemia, more acceptable to both patient/parent and physician, we deem it prudent to allow the court below to monitor, on a yearly basis, the progress of both the patient and medical research to decide whether the course charted is to be maintained or necessitates modification/termination.

Order affirmed.