Filed 3/23/22  In re Neveah G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re NEVEAH G. et al., Persons Coming Under the Juvenile Court Law. | B314361 (Los Angeles County Super. Ct. No. 21CCJP03111AB) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MELISSA L.,<br><br>    Defendant and Appellant. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Melissa L. (mother) appeals from a juvenile court judgment declaring mother's two children, Neveah G. (born May 2012) and Serena G. (born February 2014) dependents of the court under Welfare and Institutions Code section 360, subdivision (d), and asserting jurisdiction over them.[1]  Specifically, mother argues that insufficient evidence was presented to support the jurisdictional findings.  Mother contends that despite evidence of drug use by both parents, there was no evidence that the children were at risk of serious physical harm while in the care of either parent.

We find that substantial evidence supports the juvenile court's determination that the children were at risk of serious physical harm or illness as required under section 300, subdivision (b).  Therefore, we affirm the judgment.

**FACUTAL AND PROCEDURAL BACKGROUND**
**The family**

The family consists of mother, Timothy G. (father), and nine-year-old Neveah and seven-year-old Serena.[2]  When the

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Father is not a party to this appeal.  Father has an older daughter, Jaylene (occasionally spelled Jlene throughout the

children were younger the family lived with paternal grandmother (PGM). However mother left the home following an argument. The children remained with father and PGM, who took care of the children. When PGM discovered that father was using drugs, father left the home and gave the children to mother. When the dependency petition was initiated, mother was living with the children at the home of a friend.

**Referral and investigation**

On May 6, 2021, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that the parents were physically fighting in front of the children outside the home of the maternal grandmother (MGM). The children tried to stop the parents from fighting, and MGM came outside to calm the children. The reporting party stated that father came to the home intermittently. The reporting party alleged that at times mother slept outside of the home; there were multiple people living inside the home; smells of burnt plastic and marijuana emanated from the home; and on multiple occasions the police had responded to the home.

On the DCFS social worker's first visit to the home, the maternal uncle answered the door and said that mother and the children were not currently home. He added that he had no information about the family. He offered that no one at the home engaged in domestic violence or used drugs. The social worker provided her business card and asked that mother call her.

Two days later the social worker again visited the home. MGM answered the door and said that mother and the children

record), with a different mother. Jaylene is not a party to this matter but is mentioned as necessary throughout this opinion.

no longer lived there.  MGM reported that father did not live with mother and the children, that the couple had separated several years earlier, and the parents had a history of domestic violence. The parents did not have a family law order regarding the children, but the children primarily resided with mother.  Father had informal visits.  MGM provided the social worker with mother's telephone number.

In a telephone call the same day, mother confirmed that she no longer lived at MGM's home.  Mother and the children had moved from MGM's home a week prior, and mother was in the process of renting a room from a friend.  Mother denied allegations of recent violence between father and her.  Mother admitted that the couple had a history of violence, which resulted in their separation in 2018.  Mother was aware of an incident between father and his new girlfriend when father dropped off the children at MGM's home.  Mother confirmed that the children had lived with father and PGM in Victorville until recently. Mother stated that father was now living in the Los Angeles area with friends, which resulted in the children moving in with mother.  Mother stated that she and father had a good co-parenting relationship.

Mother denied knowledge of anyone using drugs at MGM's home.  She added the children had asthma, had emergency albuterol inhalers, and received regular medical care.

A week later the social worker traveled to mother's home to attempt to meet with her and the children.  The social worker was unable to enter the locked apartment building.  The social worker called mother's cell phone several times, but mother did not answer.  In response to the social worker's text message to

mother, she claimed she was not home but set up an appointment to meet with the social worker later that week.

The social worker called father's cell phone but got no answer. The social worker left a message for father to call her.

At the day and time of the social worker's scheduled meeting with mother, the social worker was again unable to enter the apartment complex. The social worker called mother four times and received no response. The social worker also sent mother a text message, which was not answered. Five hours later mother texted the social worker and asked to meet the following day at noon.

On May 27, 2021, the social worker met with mother and the children at their home, a one-bedroom, one-bathroom apartment occupied by mother's friend, Robert M. Mother and the children shared a bed in the living room. Robert slept in the bedroom. There was adequate food and the home was clean and neat with no visible safety concerns.

Mother claimed that she moved out of MGM's home because it was too crowded. She claimed not to know where father was residing, but he typically picked up the children for an hour or two to visit. Mother denied that anyone used drugs while she and the children were residing at MGM's home.

Mother admitted to using marijuana but denied using any other substances. She said she smoked marijuana outside of the home while Robert was watching the children. Mother also smoked the drug at night when the children were asleep. Mother agreed to drug test the following week. Mother denied having a criminal history, substance abuse history, DCFS history, or mental health issues.

Mother did not know where the children received medical care, since the children had been living with her for only about a month. Mother declined the social worker's offer to conduct a child and family team meeting (CFT meeting). Mother indicated that MGM was her support system. Mother signed various documents including a release of drug tests and resource packet receipt acknowledgement.

The social worker interviewed the children and Robert. Neveah was in fourth grade and Serena was in second grade. Both children denied knowledge of drugs and alcohol and denied seeing anyone acting oddly. They reported feeling safe with mother and father. Robert stated that he and mother were good friends and that mother and the children were welcome to stay with him. He had no concerns regarding the children being abused or neglected in the parents' care.

The social worker then spoke with father by telephone. Father stated that he and mother had been separated for years and had a good co-parenting relationship. Father allowed the children to live with mother starting when a dependency court case was initiated involving Jaylene, his oldest child with a different mother. Father did not have a current address and was staying with a friend.

Father denied that anyone in MGM's house used drugs or alcohol. He also denied concerns about the children being in mother's care. Father identified the children's doctor as being located in Hesperia, California, but did not know the doctor's name or specific location. Father denied any criminal history (including domestic violence), substance use history or mental health history.

On the same day that the social worker spoke with father, DCFS received a second referral that father had tested positive for drugs on May 26, 2021.[3]  Father had an open referral as to Jaylene, and it was a drug test in that matter that yielded the positive result.  The reporting party expressed concern regarding father's lack of compliance with his case plan as to the half-sibling and that the children had visited with father while he was using methamphetamine.

The social worker called father to discuss the positive test result, but father did not answer the call.  A message was left for father asking for a return call.  When the social worker attempted to reach mother to notify her of safety concerns regarding father, an automated message indicating that mother's phone had been disconnected was heard.  The social worker sent mother a text message asking mother to contact the social worker.

The next day when the social worker went to Robert's home to speak with mother and the children, Robert indicated that mother and the children had left early in the morning.  Robert provided the social worker with mother's new telephone number.

Later that day, the social worker spoke with father by telephone.  Father was with the children, and he was taking them to PGM's home in Victorville.  Father denied use of any drug-related substances since he was tested.  He agreed to work with DCFS to create a plan of care for the children in light of DCFS's concerns.  Father asked that the children be allowed to

---

[3]      Father's test results showed positive results for methamphetamine, amphetamine, and marijuana.

stay with PGM, who agreed that the children could stay with her for a few days until mother could collect them.

Father denied residing at PGM's home but admitted using it as his mailing address. Father agreed to a safety plan in which mother would coordinate with PGM for the children to be returned to mother's custody, and PGM monitored all of father's visits with the children.

PGM confirmed that the children could stay with her while mother worked out their return to her custody. PGM did not have any concerns about the parents abusing or neglecting the children, but admitted that both parents had histories of substance abuse. PGM was aware that mother used drugs about one year earlier. PGM did not know what types of drugs the parents used.

When the social worker notified mother of the new substance abuse allegations as to father, mother denied any concerns, stating that father was taking the children to PGM's home. Mother was comfortable with the children staying with PGM, as she needed assistance until she could collect them. Mother was unable to leave work to pick them up. Mother agreed to drug test first thing the following day. When the social worker advised mother that DCFS might initiate a dependency case due to its concerns regarding father, mother indicated she would cooperate.

The following day (June 11, 2021) mother sent the social worker a text message that she had not left work in time to drug test that day. The test was rescheduled for June 14, 2021. On June 14, 2021, mother sent the social worker a text message that she had been unable to secure transportation to the test site. Mother was only available to test on June 15, 2021. The social

8

worker was not able to set up a test until June 16, 2021. Mother agreed to meet with the social worker on June 16, 2021, the day after mother was going to pick up the children from PGM's house.

On June 16, 2021, the social worker sent a text message to mother to arrange a time for their meeting. Mother did not respond. The social worker called mother a few hours later, and mother did not answer. The social worker made another attempt to contact mother both by telephone and text message.

On the same day the social worker spoke with PGM, who stated that mother had not contacted PGM about the children returning to mother's care. Mother had made no plan for the children with PGM, PGM was unsure of mother's current whereabouts, and the children remained living with PGM. PGM had not heard from mother since the children arrived on June 10, 2021. Father had visited the children the previous Sunday. PGM noted that father appeared to be doing well and was taking everything seriously. PGM thought the allegations were a wake-up call regarding the potential of the children being removed from him. Four months earlier, PGM told father that he could not use drugs while living in her home, and father left. PGM did not know where father was living but believed father was living in his car.

On June 18, 2021, the social worker again unsuccessfully attempted to contact mother by telephone regarding a plan for the children to return to mother's care. A message was left and the social worker contacted father in an attempt to locate mother. Father denied having heard from mother since the children were left with PGM. Father did not consent to have Neveah and Serena removed from him because he was making efforts to address his substance abuse.

9

On June 22 and 23, 2021, the social worker again attempted unsuccessfully to contact mother. Voice messages were left, and there was no response.

On June 24, 2021, father called the social worker to report his enrollment in a substance abuse class that day. Since father did not have valid identification, he asked the social worker to make a drug test identification card for him. Father also informed the social worker that mother was having issues with her phone, and he told mother to contact the social worker.

Later that day the social worker received a text message from mother indicating that her previous telephone was broken, and she had recently received a new one. When asked if she could call mother at her new number, mother asked the social worker to call in 20 minutes as she was making dinner. When the social worker called 20 minutes later, mother did not respond. The social worker sent mother two additional text messages but received no response. The next day the social worker again called mother, but mother did not answer.

In a telephone conversation with PGM, the social worker was told that, against PGM's wishes, father took the children to live with mother on June 17, 2021. PGM said father would not listen to her, and he was mother's only chance at getting the children back. PGM spoke with mother, who confirmed that the children were living with her. PGM expressed concern about the children living with mother because they had lived at PGM's home for most of their lives and were not around mother much. PGM said father had told her that the social worker agreed that father could take the children to mother, which the social worker refuted.

On June 25, 2021, the social worker received a text message from mother indicating that mother objected to drug testing solely because father had an open dependency case. Again the social worker's attempt to call mother was unsuccessful. The social worker sent mother a text that mother had voluntarily consented to the drug tests, that DCFS was concerned about father's drug use and now had concerns about mother's drug use. Mother responded by text, "So for me to just stop everything to go and do that test just didn't make sense. I have things I have to get done you know?" The social worker's attempt to call mother was again unsuccessful.

**Detention**

On July 1, 2021, after the juvenile court authorized the children's detention, the social worker and PGM went to MGM's home to detain the children, who were there with mother. When mother asked what she could do to have the children returned to her custody, the social worker inquired if mother was willing to drug test the following day. Mother was willing to drug test the next week because the following day was her last day of work.

The social worker informed father that the children were detained with PGM. Father agreed to meet the social worker the next day to obtain his drug testing identification card. The social worker confirmed father's enrollment in substance abuse and parenting classes.

**Section 300 petition**

On July 6, 2021, DCFS filed a petition on behalf of Neveah and Serena pursuant to section 300. DCFS alleged two counts under section 300, subdivision (b)(1). Count b-1 alleged that father had a history of substance abuse and is a current user of amphetamine, methamphetamine and marijuana, which

rendered father unable to provide regular care for the children. On May 26, 2021, the father had a positive toxicology screen for amphetamine, methamphetamine and marijuana. DCFS alleged that father's substance abuse put the children at risk of serious physical harm, damage and danger.

Count b-2 alleged that mother had a history of substance abuse and is a current abuser of marijuana, rendering mother incapable of caring for the children. On prior occasions mother possessed, used, and was under the influence of marijuana while caring for the children. DCFS alleged that mother's substance abuse put the children at risk of serious physical harm, damage and danger.

**Detention hearings**

At the initial detention hearing on July 9, 2021, the court made prima facie findings, detained the children from the parents on an emergency basis, and ordered monitored visitation for the parents with DCFS having discretion to liberalize. The children were released to PGM.

The detention hearing was held on July 12, 2021. Mother and father entered general denials. Mother's counsel asked the court to return the children to mother on the ground that DCFS had failed to show risk of harm to the children. Father's counsel argued that the children should be released to father, since the dependency court had dismissed the allegation regarding father in the matter concerning his older daughter, Jaylene. Father's counsel argued that in PGM's home, there was an additional layer of supervision. Counsel for the children requested that if the court was inclined to release the children to the parents, additional safety measures be put in place. Counsel asked that father be ordered to have a clean drug test and remain in the

12

home of PGM with the children.  Children's counsel asked that the children be released to the parents, "or in the alternative a CFT to be held for a safety plan to be hammered out to be able to be safely released back to the parents."

The juvenile court ordered the children detained from the parents and released to PGM with monitored visits for the parents and discretion for DCFS to liberalize.  The court ordered the parents to submit to on-demand, weekly drug testing. Adjudication was set for July 30, 2021.

**Jurisdiction/disposition report**

DCFS filed a jurisdiction/disposition report in advance of the adjudication hearing.  The children reported being happy with PGM, but they also wanted to reunify with their parents.

Contrary to her representation, mother had a criminal record as well as an outstanding warrant.  In 2009, mother had been arrested for burglary.  In 2019, mother had been arrested for possession of a controlled substance and driving without a license.[4]  Mother had an outstanding warrant for a pending charge of consuming an alcoholic beverage in a public setting.

---

[4]     A police report of October 19, 2019, reflected that mother was arrested for possession of a controlled substance and driving without a license.  Mother was stopped while driving with a broken license plate lamp and an expired vehicle registration. The officer observed a tall, opened can of Mike's Hard Lemonade (an alcoholic beverage) in the front seat center cup holder. Mother admitted to having taken a few sips of the alcoholic beverage prior to driving.  She also had methamphetamine in her bra, which she had picked up for a friend.  Mother's blood alcohol level was deemed to be 0.00 percent, although she lost her balance during the "walk and turn" test.  Mother was arrested for possession of a narcotic.

When the social worker informed mother of the outstanding warrant, mother said she was not really aware of it, but she would have it resolved.

Father also had a criminal history and an outstanding warrant. Father's criminal history included charges of vandalism, domestic violence, driving without a license and failure to prove financial responsibility. Father had an outstanding bench warrant pending on a vandalism charge. When informed of the outstanding warrant, father claimed he forgot about the hearing but that he would take care of it.[5]

Father also had a child welfare history regarding Jaylene. In addition to the dependency court case, there were two referrals in July 2013 against father and Jaylene's mother for neglect and emotional abuse of the child. The domestic violence allegations were deemed unfounded. The referral for neglect was resolved.

In an interview with the dependency investigator (DI) on July 15, 2021, mother disclosed that she and father were in a relationship for eight years, which ended in 2018. During their relationship father used marijuana regularly. He also used methamphetamine once a month. Mother had used methamphetamine with father once or twice while the children were with MGM or PGM. The parents would get a room for the

---

[5] A police report dated February 20, 2020, showed that father was arrested for speeding in a vehicle and driving without a license. The arresting officer discovered that father had three active warrants for traffic violations in San Bernardino County. During the arrest, father disclosed that he had a bag of methamphetamine stored in his vehicle. The police found the drug and arrested father for possession of methamphetamine and driving with a suspended license.

weekend to use methamphetamine. Marijuana helped calm father, otherwise he would be irritated. Methamphetamine made him tired and cranky, but he would sleep off the drug.

Though mother did not believe she was a heavy user and denied she had a problem with drugs or alcohol, mother confirmed she had a history of drug and alcohol use, having begun using marijuana when she was 14 years old. She was now 28 years old. She last used marijuana one week earlier. She had used methamphetamine a handful of times, most recently about a year ago.[6] Mother stated she drank alcohol on occasion. She had been a heavy drinker, drinking almost daily, but now she drank once every two weeks. Mother would typically drink a 24-ounce bottle of vodka. Mother was willing to submit to drug testing.

Mother was unemployed and lived in Robert's apartment.

When the DI interviewed father by telephone the same day, father admitted to using methamphetamine once in a while, but denied he was addicted to the drug. He first used methamphetamine when he was 20 years old. Father was now 31 years old. Father denied he had ever brought the drug into the home. The last time he used the drug was when he tested positive on May 26, 2021.

Father used marijuana to help him with attention deficit hyperactivity disorder. He began using the drug when he was 16 years old and used it two to three times daily to help him relax. Father kept the marijuana stored in his bedroom, and no one had access to it. Father denied he had a problem with marijuana.

---

[6] Mother admitted to using marijuana before bedtime to help her sleep and in the morning to help with her appetite.

Father had enrolled in a drug treatment program and completed one week of treatment before he was unable to continue due to car problems. Father did not know whether he was still enrolled in the program, as people were generally discharged after excessive absences. Father was willing to drug test. Father claimed to be unaware of the weekly drug testing referral. When the DI advised that the social worker had texted him the drug testing referral on July 14, 2021, father responded, "Oh yeah, she did send me a text but I didn't read it." The DI advised father to read his texts from the social worker and advised father that a missed drug test would be considered a failed test.

Father denied any knowledge of mother's drug use, although he stated that she drank alcohol.

Neveah and Serena were also interviewed. They reported that they did not know anything about drugs and had not observed their parents using drugs. Neveah reported that mother drank "[l]ike two bottles a day. In the afternoon. She acts the same." Neveah indicated that the bottles were about 12 inches tall.

PGM stated that she was aware that father was using methamphetamine for about a year. She told father that he needed to get help and that he could not live in her home if he did not straighten out his life. PGM reported that father used marijuana to relax. She indicated that father needed to get into a program to become sober. The last time she spoke to father, he was looking for a substance abuse program to join. PGM did not know where father was living, although she believed he was in a drug treatment program.

16

PGM reported that mother liked to drink a lot of alcohol. When mother lived in PGM's home, she would drink two or three 40-oz. bottles of beer daily. Mother's drinking caused a lot of arguments between the parents, although PGM denied that mother got violent. PGM reported that mother called the children every other day, and father called them every day. Father had visited the children twice. Mother told the DI that she had not asked for visits earlier, because she did not have transportation. The DI advised mother to request a bus pass.

DCFS noted that the parents' drug use posed serious risks to the children's well-being. DCFS also noted that father had active warrants for his arrest, did not have stable housing, and was not enrolled in any services. DCFS recommended that the section 300 petition be sustained, the children removed from parental custody, and the parents be provided with family reunification services.

In a last minute information for the court, DCFS noted that mother failed to appear for her drug tests on June 11, 14, and 16, and July 20, 2021. Father missed two drug tests on July 16 and 19, 2021.

## Adjudication

At the adjudication hearing, DCFS argued that the court should sustain the petition as pled. The children's counsel submitted on sustaining the petition with suitable placement at the home of PGM.

Mother's counsel, joined by father's counsel, argued that the petition should be dismissed. Father's counsel argued that missed drug tests were not affirmative evidence of drug use and that father had attempted to enroll in a drug treatment program. Additionally, father's counsel pointed out that the juvenile court

had dismissed the substance abuse count against father in the pending matter involving father's oldest daughter.

The court found that the children were at substantial risk due to the parents' histories of use and abuse of alcohol, marijuana, and methamphetamines. The court sustained the two counts of the section 300 petition as pled and took jurisdiction over the children. The court, however, declined to remove the children from the parents, as it found that DCFS had not shown by clear and convincing evidence that removal was warranted. Instead, the court found that there were reasonable safeguards that could be put in place such that the children could be returned to parents, including "father returning back to [PGM] where the children are living in Victorville so [PGM] can be an additional set of eyes and ears."

The court ordered the parents to clear all warrants, participate in full drug and alcohol programs with random on-demand drug testing, a 12-step program with aftercare, a parenting program, and individual counseling to address case issues.

**Subsequent events**

On July 30, 2021, mother timely appealed.

On November 24, 2021, the juvenile court ordered the case transferred to San Bernardino County.[7]

---

[7]     DCFS has filed a motion for judicial notice, asking this court to take notice of the juvenile court's orders of November 24, 2021, transferring the matter to San Bernardino County. The motion is granted.

**DISCUSSION**

Mother argues that the juvenile court lacked sufficient evidence to support its findings under section 300, challenging the jurisdictional findings regarding both parents.[8]  Specifically, mother argues that the allegations against the parents failed to show that the children were at risk of serious physical harm.

**I.     Applicable law and standard of review**

Section 300, subdivision (b) permits a juvenile court to assert jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse."  The three-part test for jurisdiction under section 300, subdivision (b)(1) includes: "(1) inability to provide the necessary supervision or protection of children; (2) causation; [and] (3) serious physical harm or illness, or the substantial risk of either."  (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 21-22 (*Ma.V.*).)

"'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether

---

[8]     "For purposes of appellate standing in dependency cases, a parent is aggrieved by a juvenile court order that injuriously affects the parent-child relationship."  (*In re Paul W.* (2007) 151 Cal.App.4th 37, 62.)  Neither party has addressed the question of mother's standing to challenge the jurisdictional findings as to father.  However, we need not decide whether mother has shown the requisite injury to confer standing to challenge the jurisdictional finding as to father because we conclude that substantial evidence supports the jurisdictional findings as to both parents.

19

circumstances *at the time of the hearing* subject the minor to the defined risk of harm.'" (*Ma.V., supra,* 64 Cal.App.5th at p. 23.) However, when a child is at risk of serious harm, the juvenile court may take jurisdiction before the child has suffered any actual harm. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1003 ["The state, having substantial interests in preventing the consequences caused by a perceived danger is not helpless to act until that danger has matured into certainty."].) State action to protect children is intended to prevent harm, and the juvenile court is empowered to act where there is a potential serious risk to the child. (*Ibid.*)

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Substantial evidence is evidence that is "meaningful and significant and [not] merely speculative." (*Ma.V., supra,* 64 Cal.App.5th at p. 22.)

## II. Substantial evidence supported the juvenile court's true finding as to count b-1

Count b-1 alleged that father had a history of substance abuse and was a current user of amphetamine, methamphetamine, and marijuana, which rendered father unable to provide regular care for the children. The record supported the juvenile court's finding that the children were at risk of serious harm due to father's continuing drug abuse.

20

Father admitted using methamphetamine since he was 20 years old. He was now 31. Father continued using methamphetamine even after a dependency matter was initiated as to his oldest child, Jaylene, leading to a positive toxicology screen for father on May 26, 2021. Father also admitted to using marijuana regularly since the age of 16 to help him with attention deficit hyperactivity disorder. While father initially enrolled in a drug program, his commitment to the program lasted only one week. Father admitted he was unable to attend after completing one week of the program and consequently did not know whether or not he was still enrolled. In spite of the court's order, father failed to drug test, missing scheduled tests on July 16 and 19, 2021. These missed tests are properly considered positive tests. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217.) Father had an extensive criminal history, including a charge involving possession of methamphetamine. He had an outstanding warrant during the proceedings and claimed he forgot about the criminal court hearing. He was unemployed and living with friends.

When PGM discovered that father was using drugs, instead of refraining from drug use, he chose to leave PGM's home and pass the children to mother. According to PGM, the children had never before spent much time with mother. Father was willing to disrupt the children's lives and leave them with mother, who was also suffering from drug and alcohol problems. While father denied knowledge of mother's drug use, he admitted she drank alcohol. After father returned the children to PGM's custody, he lied to PGM, telling her that the social worker authorized him to take the children back to mother. As father admitted he did not have valid identification, the court could justifiably infer that

21

father was transporting the children without a valid driver's license.

The juvenile court properly considered all the above factors in determining that the children were at present risk of serious harm. Despite father's claim that his drug use did not interfere with his parenting, the juvenile court was justified in concluding otherwise that father's drug use was affecting every aspect of his life, including his ability to parent his children. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766 ["The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case."].) Given that Neveah and Serena were only seven and nine years old, the juvenile court was justified in anticipating serious risk to the children from father's unresolved drug abuse.

Mother emphasizes that the juvenile court dismissed the substance abuse allegation against father in Jaylene's case. However, mother fails to provide legal authority as to the significance of that dismissal in this matter. Further, the juvenile court was considering different evidence in this matter. As set forth above, the court was considering more than the positive toxicology screen alone. The evidence before the court was sufficient to show a risk of serious harm to the young children.

## III. Substantial evidence supported the juvenile court's true finding as to count b-2

Count b-2 alleged that mother had a history of substance abuse and is a current abuser of marijuana, rendering her incapable of providing regular care for the children. The record supported the juvenile court's finding that the children were at risk of serious harm due to mother's continuing drug abuse.

Mother has used marijuana since she was 14 years old. Mother smoked marijuana at bedtime to help her sleep and in the morning to help with her appetite. Despite twice daily reliance on marijuana, she denied being a heavy user and denied that she had a problem with drugs. Although she voluntarily agreed to participate in drug tests, she failed to attend her scheduled tests. These missed tests are properly considered to be positive tests. (*In re Christopher R., supra*, 225 Cal.App.4th at p. 1217.) Mother minimized the severity of her drug problem as she missed these tests. Mother's denial of her drug problem, and her refusal to address the problem, can be considered evidence of the severity of the problem. (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."].)

Like father, mother was unemployed and staying with a friend. Also like father, mother had a criminal history including possession of methamphetamine. Mother had an outstanding warrant at the time of the investigation, and despite agreeing to resolve it, she had not done so at the time of the jurisdiction hearing. Mother was uncooperative and unresponsive throughout the investigation. The majority of the social worker's visits, calls, and texts were ignored. This remained true even after mother was informed that father had tested positive for drugs, including methamphetamines, on May 26, 2021. Mother expressed no concerns about father's positive drug test and continued to avoid the social worker's attempts to contact her to create a safety plan for the children.

The juvenile court properly considered all these factors in determining that the children were at present risk of serious harm from mother's drug use. Because of the young ages of the

children, the juvenile court was justified in anticipating serious risk to the children from mother's unresolved drug use.

Mother cites *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003, for the proposition that a parent's marijuana use, "'*without more*,' does not bring a minor within the jurisdiction of the dependency court." The present matter is distinguishable. As discussed above, mother exhibited more than just marijuana use. She failed to drug test, was uncooperative with the social worker, and minimized both her own and father's drug use.[9]

Mother further argues that harm is not presumed from a parent's mere use—as opposed to abuse—of drugs. (*In re L.C.* (2019) 38 Cal.App.5th 646, 652.) Mother points out that the definition of abuse is "'cravings and urges to use the substance; spending a lot of time getting, using, or recovering from use of the substance; giving up important social, occupational or recreational activities because of substance use; and not managing to do what one should at work, home or school because of substance use.'" (*Ibid.*) Mother claims that no evidence in the record supported any of these indicia of substance abuse on the part of mother.

We disagree. Mother's obligations to her family included drug testing, communicating with the social worker, putting together a safety plan to protect the children from father's drug use, and clearing her criminal record. Mother was not doing what she needed to do in order to provide a safe home for her children. The juvenile court was permitted to infer that mother's

---

[9] We note that—in contrast to this case—at the time of the jurisdictional hearing, the mother in *Destiny S.* "had tested clean for marijuana and methamphetamine for three months." (*In re Destiny S., supra*, 210 Cal.App.4th at p. 1004.)

failure to meet her obligations resulted from her constant use of marijuana. That the children had never observed mother using drugs does not minimize the risks of mother's behavior.

Drawing all reasonable inferences from the evidence to support the findings and orders of the dependency court, as we must (*In re R.T., supra*, 3 Cal.5th at p. 633), we find that the evidence before the court was sufficient to show a risk of serious harm to the children.

## DISPOSITION

The judgment is affirmed.

_____

CHAVEZ, J.

We concur:

_____

ASHMANN-GERST, Acting P. J.

_____

HOFFSTADT, J.