J-A06039-26

2026 PA Super 84

| IN THE INTEREST OF: C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: I.Q., STEP-FATHER | : | |
| | : | |
| | : | No. 899 WDA 2025 |

Appeal from the Order Entered June 24, 2025
In the Court of Common Pleas of Allegheny County Juvenile Division at
No(s):  CP-02-DP-0000047-2023

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

OPINION BY BECK, J.:                    **FILED: April 23, 2026**

I.Q. ("Stepfather") appeals from the June 24, 2025 order that changed the permanency goal of his stepdaughter, C.B., born in May 2012, from reunification to subsidized permanent legal custodianship ("SPLC").[1] Stepfather's court-appointed counsel, Attorney Aaron Sontz, has filed an application to withdraw and a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), and *In re J.D.H.*, 171 A.3d 903 (Pa. Super. 2017) (extending *Anders* practice to appeals from "goal change orders" in dependency proceedings).  After careful review, we grant Attorney Sontz's petition to withdraw and affirm the goal change order.

---

[1]  SPLC is "an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis to a custodian.  Parental rights are not terminated." *In re S.H.*, 71 A.3d 973, 977-78 (Pa. Super. 2013).

We gather the relevant factual and procedural history of this matter from the certified record. Stepfather's involvement in this case is based upon his status as the husband of C.B.'s mother, A.Q. ("Mother"), who died in January 2016.[2] Allegheny County Office of Children, Youth and Families ("CYF") has been involved with this family since shortly after Mother's death, at which time, C.B. continued to reside with Stepfather and her half-siblings: M.L. (together with C.B., "the children"), born in November 2015, Stepfather's daughter from a separate relationship; and O.L., the children's older half-brother. Of particular note, O.L. was adjudicated dependent and removed from the home in November 2019 after he was found to have sexually abused C.B. *See* N.T., 8/21/2024, at 26; N.T., 5/10/2024, at 44-45; N.T., 4/19/2023, at 11-12.

Mother's death also resulted in custody litigation concerning C.B. in the Court of Common Pleas of Allegheny County between Stepfather and C.B.'s biological father, T.H.B. ("Father").[3] On March 23, 2021, the trial court entered an interim custody order awarding Stepfather primary physical custody of C.B. and Father partial physical custody on the second and fourth Sunday of every month. *See* N.T., 2/1/2023, at 8-9. The interim custody

---

[2] The circumstances of Mother's death are not clear from the available record.

[3] Father participated in the underlying dependency proceedings and was originally identified as a potential placement option for C.B. Ultimately, however, Father indicated his support for changing C.B.'s permanency goal to SPLC. *See* N.T., 6/17/2025, at 8. He did not appeal the goal change order.

order also awarded Stepfather and Father shared legal custody of C.B. **See** Order of Adjudication and Disposition, 5/18/2023, ¶ 18.

On December 16, 2022, CYF received a referral indicating that the family was living outside of the children's designated school district while they continued to attend the same schools. **See** N.T., 2/1/2023, at 6. When contacted by school officials, however, Stepfather "would not participate in coming up with a plan" to address the situation. **Id.**

On January 9, 2023, CYF received a referral that M.L. had been placed on out-of-school suspension for bringing knives to her elementary school. **See** N.T., 4/19/2023, at 13-17. Despite the suspension, however, M.L. continued to come to school on a daily basis. **See id.** Accordingly, CYF and school officials suspected that there was no one to supervise the children at home. **See id.** at 106-08. When contacted by school officials regarding these concerns, Stepfather claimed he was legally entitled to leave the children unattended and refused to cooperate further. **See id.**

On January 26, 2023, C.B. disclosed to one of her teachers that she and M.L. had been left alone in the family home for approximately ten days without any contact with Stepfather. **See id.** at 27-28, 36. M.L. was separately interviewed and generally corroborated C.B.'s report that Stepfather had been absent for multiple days, although she could not specify how many days. **See id.** at 19. At the time of these disclosures, C.B. was ten years old and M.L.

was seven years old. In Stepfather's absence, C.B. had been forced to care for both herself and M.L. *See id.* at 28.

Pursuant to a verbal court authorization, CYF took the children into protective custody the same day. On January 27, 2023, CYF sought and received a written order granting it emergency protective custody of the children. The children were immediately placed into foster care in the home of S.H. ("Foster Mother"). *See* N.T., 2/1/2023, at 13. C.B. has remained in Foster Mother's custody since January 2023.[4] *See* N.T., 5/10/2024, at 5.

The juvenile court held a shelter care hearing on February 1, 2023. Therein, CYF requested that the children's future contact with Stepfather be supervised based upon the following concerns:

> Both girls have been prepped what to say and not to speak to us or anyone else about what is going on in the home. Both girls were very afraid to let us know exactly what was going on. They stated that anytime they tell anybody what goes on in the home, they are both spanked by [Stepfather].

N.T., 2/1/2023, at 10. Stepfather appeared at the hearing pro se and testified. He conceded that he had been absent from the home for extended periods of time, which he claimed was caused by working long hours as a commercial driver. *See id.* at 19-20. He maintained, however, that it was inappropriate to remove the children from his care since the home had functioning utilities and was stocked with food. *See id.* at 22-23.

_____

[4] M.L. was removed from Foster Mother's custody in April 2023 based upon recurrent behavioral issues in the home.

On February 9, 2023, the juvenile court filed a shelter care order confirming the children's placement. The order further stipulated that all contact between Stepfather and the children was to be supervised. **See** Shelter Care Order, 2/9/2023, at 3. The terms of this order afforded Stepfather a "minimum" of two supervised visits per week. **See id.** As Stepfather failed to maintain contact with CYF and made no effort to schedule these visits, however, they did not occur.

CYF filed a dependency petition alleging that C.B. was without proper parental care or control pursuant to 42 Pa.C.S. § 6302(1). **See** Dependency Petition, 2/8/2023, at 1-6. The juvenile court appointed both a guardian ad litem ("GAL") to represent C.B.'s best interest and counsel to represent C.B.'s legal interests in the proceedings. **See** Juvenile Court Orders, 2/7/2023, 2/22/2023, 3/11/2025.

On April 19, 2023, the juvenile court held a hearing on CYF's dependency petition, which included testimony from nine separate witnesses. Stepfather represented himself and was also one of the testifying witnesses during the hearing.

Stepfather supplemented his shelter care hearing testimony by explaining that, on the date of the children's removal, he was working as a commercial driver operating between Pittsburgh, Pennsylvania, and Rochester, New York. **See** N.T., 4/19/2023, at 173-74. He conceded that this job had required him to be out of the home from approximately 4:00 a.m.

until 6:00 p.m. and also required him to remain away from home "overnight" multiple times per week. ***See id.*** at 183-86. He stated, however, that since the children's removal from his care, he lost his job in February 2023. ***See id.*** at 174. In addition to his work-based absences, Stepfather also admitted he was in the habit of leaving the children alone "overnight." ***See id.*** at 179-81. Stepfather acknowledged it was entirely possible that the children had gone several days without any contact with him. ***See id.*** at 188.

Stepfather stated his belief that it was acceptable to leave the children unattended because he claimed that the home was equipped with "video surveillance" and a "two-way speaker" that allowed him to monitor, and communicate with, the children remotely. ***Id.*** at 151-52, 172-73, 189-90. Stepfather also indicated that he relied upon his neighbors to keep an eye on the children when he was not around. ***See id.*** at 181, 189-90.

On May 3, 2023, the juvenile court held a second hearing regarding CYF's dependency petition, wherein, inter alia, the children testified. In her testimony, C.B. described her day-to-day routine while living with Stepfather, which demonstrated that she was responsible for the care of herself and M.L., i.e., waking up, getting ready for school, preparing food, and going to bed at night. ***See*** N.T., 5/3/2023, at 36-43. C.B. further confirmed that Stepfather had been absent from the home for multiple days in a row. ***See id.*** at 45. M.L. similarly testified that, while living with Stepfather, she was largely left in C.B.'s care. ***See id.*** at 78-84.

At the conclusion of the hearing, the juvenile court indicated its intent to adjudicate the children dependent based upon its conclusion that Stepfather had exercised "bad judgment" by leaving the children unsupervised for extended periods of time. *Id.* at 177-79. On May 18, 2023, the juvenile court entered an order adjudicating C.B. dependent and established her placement goal as reunification with a parent or legal guardian.[5] No party appealed.

Between August 2023 and April 2024, Stepfather ceased participating in C.B.'s dependency proceedings. He continued to decline supervised visitation with C.B. and refused to communicate with CYF. *See* Permanency Review Order, 8/30/2023, at 2 ("[S]tepfather is not involved in case planning. He refuses to visit with the [children] and has not had contact with CYF."); Permanency Review Order, 1/13/2024, at 2 (same).

On April 16, 2024, the Juvenile Court Project entered its appearance on behalf of Stepfather. From this point, Stepfather began participating in the court proceedings again. The next permanency review hearing occurred on May 10, 2024. At that time, Stepfather requested that C.B. be restored to his custody. *See* N.T., 5/10/2024, at 29. He testified that he was now acting as a "stay-at-home dad" since O.L. returned to his care in June 2023. *Id.* During the hearing, however, Stepfather became combative and repeatedly

---

[5] On August 30, 2023, the juvenile court entered a permanency review order that established C.B.'s concurrent permanency goal as adoption.

attempted to speak over the hearing officer. *See id.* at 37-41. He was ultimately arrested and charged with disorderly conduct. *Id.*

On June 4, 2024, the juvenile court filed a permanency review order in connection with the May 10, 2024 hearing, which directed Stepfather to undergo a "full assessment" and to "cooperate with CYF." Permanency Review Order, 6/4/2024, at 3. The juvenile court further ordered that any supervised visits between C.B. and Stepfather would occur at C.B.'s "sole discretion." *Id.* Finally, the juvenile court ordered that Stepfather and C.B. undergo interactional and individual psychological evaluations. *Id.* at 4.

In August 2024, the Juvenile Court Project withdrew as counsel for Stepfather with the leave of the juvenile court. Thereafter, Stepfather was briefly represented by private counsel between November 2024 and February 2025, at which point private counsel also withdrew. On February 20, 2025, the juvenile court appointed Attorney Marjorie Crist to represent Stepfather.

The juvenile court held further permanency review hearings between November 2024 and April 2025, wherein Stepfather's compliance and progress with the juvenile court's directives was deemed to be minimal. Specifically, Stepfather continued to refuse to participate in supervised visits and would not communicate or cooperate with CYF. Overall, the certified record reflects that Stepfather had virtually no contact with C.B. between January 2023 and June 2025, aside from court appearances. He also failed to complete his court-ordered evaluations.

On May 21, 2025, CYF filed a motion requesting that C.B.'s primary permanency goal be changed to SPLC. The juvenile court held a hearing on CYF's goal change petition on June 17, 2025, at which time C.B. was thirteen years old. At the goal change hearing, CYF adduced testimony from Foster Mother; Dr. Beth Bliss, who conducted psychological and interactional evaluations of C.B. and Foster Mother; and CYF caseworker Edward Clark. Stepfather was represented by Attorney Crist at the hearing and appeared by telephone. As a result of technical difficulties, Stepfather was disconnected before he was able to testify. *See* N.T., 6/17/2025, at 18. Attorney Crist offered a summary of Stepfather's intended testimony, which the juvenile court and the parties accepted without objection. *See id.* at 99-102. The record reflects that both of C.B.'s court-appointed attorneys advocated in favor of changing her permanency goal to SPLC.[6] *See id.* at 104-07.

At the conclusion of the hearing, the juvenile court stated that it was "fully persuaded that it serves [C.B.'s] best interests to establish [SPLC] as her permanency goal." *Id.* at 113. Additionally, the juvenile court explained its rationale and made a number of legal and factual findings on the record. *See id.* at 110-26. On June 24, 2025, the juvenile court filed an order formally changing C.B.'s primary permanency goal from reunification to SPLC.

---

[6] C.B.'s GAL filed a brief in this Court advocating in support of affirming the goal change order. *See* GAL's Brief at 2-16. C.B.'s counsel did not file a brief on C.B.'s behalf, likely because it would be duplicative.

On July 23, 2025, Stepfather timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On September 2, 2025, the juvenile court submitted a Rule 1925(a)(2)(ii) opinion that referred to the on-the-record reasoning it provided at the conclusion of the June 17, 2025 hearing.

Thereafter, Attorney Crist withdrew her representation of Stepfather and on October 17, 2025, Attorney Sontz entered his appearance. On December 1, 2025, Attorney Sontz submitted an application to withdraw as counsel and an **Anders** brief explaining his conclusion that Stepfather's potential appellate claims were frivolous. Accordingly, we must begin our review by assessing counsel's request to withdraw. **See In re Adoption of B.G.S.**, 240 A.3d 658, 661 (Pa. Super. 2020) ("When faced with a purported **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.").

In order to successfully withdraw pursuant to **Anders**, counsel must: (1) petition the court for leave to withdraw and aver that, after making a conscientious examination of the record, he or she has determined that an appeal would be frivolous; (2) furnish a copy of the **Anders** brief to the appellant; and (3) advise the appellant that of the right to retain private counsel or proceed pro se to bring any additional arguments to the court's attention. **Id.** To confirm client notification has occurred, counsel must provide a copy of the letter advising the appellant of these rights in conformity

with *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005). *See B.G.S.*, 240 A.3d at 661.

This Court has also adopted additional requirements that are "unique to dependency and adoption proceedings." *J.D.H.*, 171 A.3d at 906. Where counsel seeks to withdraw from a dependency action "prior to the entry of an involuntary termination decree," counsel must additionally "inform the parent of his or her right to counsel in any subsequent dependency or involuntary termination proceedings." *Id.* at 906-07; *see also* 42 Pa.C.S. § 6337 ("Right to counsel"). Counsel must also "inform the parent that, if he or she cannot afford counsel, he or she may contact the trial court in order to obtain new counsel." *J.D.H.*, 171 A.3d at 907. This information must be conveyed "at the same time that counsel informs the parent of his or her other rights" under *Anders*. *Id.*

Our initial review of Attorney Sontz's application to withdraw confirmed that he had submitted an application and a brief pursuant to *Anders*. Attached to counsel's brief was a *Millisock* letter dated December 1, 2025, which advised Stepfather of his rights to retain alternative private representation or proceed pro se to advance any supplemental arguments before this Court. *See Anders* Brief at Appendix C. This letter also indicates that counsel provided Stepfather with a copy of the *Anders* brief. *See id.* The letter did not, however, contain the advisements required by this Court pursuant to *J.D.H. Compare id. with J.D.H.*, 171 A.3d at 906-07. On March

24, 2026, this Court filed an Order directing Attorney Sontz to send a revised letter that complies with *J.D.H.* to Stepfather and provide us with a copy of the corrected communication within ten days. On March 27, 2026, Attorney Sontz timely complied. *See* Certification of Delivery, 3/27/2026. Based upon this submission, we conclude that counsel has complied with the procedure and notice requirements attendant to *Anders* pursuant to *Millisock* and *J.D.H.*

We now turn to review the sufficiency of the *Anders* brief submitted by Attorney Sontz. Our caselaw requires that *Anders* briefs must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes would arguably support the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. *See B.G.S.*, 240 A.3d at 661 (citing *Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009)). A fully compliant *Anders* brief should "articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous." *Id.*

The *Anders* brief submitted by Attorney Sontz provides a thorough summary of the facts and procedural history of this matter, which includes citations to the certified record and a recitation of the relevant events in these proceedings. *See* Anders Brief at 6-16. The brief also contains a discussion of governing Pennsylvania law concerning dependency proceedings and the

entry of goal change orders. *See id.* at 20-54. In his discussion, Attorney Sontz explains his reasons for concluding that Stepfather's potential grounds for appeal are wholly frivolous based upon the well-supported findings of the juvenile court. *See id.* Thus, we conclude that his *Anders* brief is compliant with our case law.

On December 31, 2025, Stepfather submitted a pro se response. On January 5, 2026, he filed an amended pro se response raising several additional claims. In conformity with our governing case law, we deem Stepfather's submission to be an advocate's brief. *See Commonwealth v. Bennett*, 124 A.3d 327, 333 (Pa. Super. 2015) ("When an appellant, either acting pro se or through private counsel, files a response to the *Anders* brief, our independent review is limited to those issues raised in the *Anders* brief. We then review the subsequent pro se or counseled filing as we do any advocate's brief.") We therefore turn our attention to the merits of the claims raised.

Attorney Sontz has raised the following four issues for our consideration in his *Anders* brief:

> 1. Did the dependency court abuse its discretion when it granted the goal change based on incorrect and/or fabricated evidence?
>
> 2. Did the dependency court abuse its discretion when it adjudicated C.B. dependent because [CYF] failed to present clear and convincing evidence that C.B. was without proper parental care or control and that such care and control was immediately available?

3. Did the dependency court abuse its discretion when it placed C.B. out of the home even if the evidence was sufficient to sustain the dependency adjudication because [CYF] failed to present clear and convincing evidence that removing C.B. was clearly necessary and that there were no reasonable alternatives to removal?

4. Did the dependency court abuse its discretion when it granted the motion to change the goal from reunification to SPLC because [CYF] failed to make reasonable efforts to assist [Stepfather] and violated his constitutional rights under the [Fourteenth] Amendment [to] the United States Constitution and Article I[, S]ection I of the Pennsylvania Constitution?

*Anders* Brief at 5 (issues reordered for ease of disposition). We note that the majority of the claims raised by Stepfather in his pro se responses are largely duplicative of the claims raised in the *Anders* brief. *See* Amended Pro Se Response, 1/5/2026, ¶¶ 2(A)-(B), (D)-(G). Thus, we will address the arguments made in support of these issues together.

Our standard of review of dependency cases is well established:

In dependency proceedings[,] our scope of review is broad. Nevertheless, we will accept those factual findings of the trial court that are supported by the record because the trial judge is in the best position to observe the witnesses and evaluate their credibility. We accord great weight to the trial judge's credibility determinations. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.

*Interest of R.H.*, 320 A.3d 706, 714 (Pa. Super. 2024) (cleaned up).

The first issue identified by both Attorney Sontz and Stepfather is that the juvenile court allegedly relied upon inaccurate testimony and erroneously concluded that O.L. sexually assaulted both of the children in ordering the

- 14 -

underlying goal change.[7] **See Anders** Brief at 36-38; Amended Pro Se Response, 1/5/2026, ¶¶ 2(E)-(F).[8] This argument concerns testimony from CYF supervisor Michele Haney at the May 10, 2024 permanency review hearing, wherein she averred that the children had both been sexually assaulted by O.L. **See** N.T., 5/10/2024, at 44-47. Consequently, the juvenile court made a finding that the children "were perpetrated on" by O.L. Permanency Review Order, 6/4/2024, at 3. At a subsequent permanency review hearing, however, Ms. Haney clarified that while CYF received referrals alleging that O.L. had sexually assaulted both children, only the claims regarding C.B. were "validated" by CYF's investigation. N.T., 8/21/2024, at 26. The juvenile court did not issue any further findings regarding O.L.'s history of assaultive behavior towards C.B.

Stated simply, the gravamen of this claim is not supported by the record. Viewed in its entirety, Ms. Haney's testimony accurately apprised the juvenile court that O.L.'s sexual assault of C.B. was validated, while the

---

[7] This issue was raised in both pro se and counseled motions submitted to the juvenile court. **See** Petition for Appointment of Counsel and Continuance, 4/1/2025, ¶ 2(B); Motion to Inform Court, 4/1/2025, ¶ 6.

[8] In addition to the testimony discussed above, Stepfather's pro se response makes passing, largely incomprehensible references to allegedly fraudulent testimony presented at the shelter care hearing and certain permanency review hearings that occurred between February 2023 and May 2024. **See** Amended Pro Se Response, 1/5/2026, ¶¶ 2(E)-(F). To the extent Stepfather intends to challenge this additional evidence as fraudulent or inaccurate, we are unable to ascertain the precise nature of his objections.

parallel allegations concerning M.L. were not. *See* N.T., 8/21/2024, at 26; N.T., 5/10/2024, at 44-47. There is nothing in the record suggesting that the juvenile court misapprehended or mischaracterized these facts, let alone relied upon them, in issuing the underlying goal change order.[9] Accordingly, we agree with Attorney Sontz's conclusion that this claim is wholly frivolous.

We will address the second and third claims presented by Attorney Sontz and Stepfather together, as they both purport to challenge aspects of the juvenile court's dependency adjudication of C.B. *See Anders* Brief at 38-54; Amended Pro Se Response, 1/5/2026, ¶¶ 2(D)-(G). The juvenile court filed the order adjudicating C.B. dependent on May 18, 2023, i.e., more than two years prior to the filing of the instant appeal. *See* Order of Adjudication and Disposition, 5/18/2023, at 1-6. Our case law clearly states that an adjudication of dependency is final and, thus, immediately appealable as a "change of status." *In re E.B.*, 898 A.2d 1108, 1112 n.3 (Pa. Super. 2006) (internal citations omitted). Stepfather, however, did not appeal C.B.'s dependency adjudication. As a matter of justiciability, we must decline his attempt to mount a collateral attack on that holding in this appeal. *Cf.* Pa.Rs.A.P. 902(b)(2) (rendering "invalid" any appeal that it is not taken within the time limits set by Rule 903), 903(a) (requiring that appeals be filed "within

---

[9] We also note that the parties, including Stepfather, stipulated to the truth and accuracy of an averment in CYF's dependency petition stating that both of the children had, in fact, been sexually assaulted by O.L. *See* Dependency Petition, 2/8/2023, ¶ 8; N.T., 4/19/2023, at 11-12.

30 days after the entry of the order from which the appeal is taken"). We therefore agree with Attorney Sontz's conclusion that both claims are wholly frivolous.

Although styled as a unitary matter, Attorney Sontz's fourth and final issue consists of two separate lines of argument: (1) that the goal change order violated Stepfather's constitutional rights to familial integrity; and (2) the evidence was insufficient to support the juvenile court's findings pursuant to 42 Pa.C.S. § 6351(f)-(f.2). *See Anders* Brief at 20-36; Amended Pro Se Response, 1/5/2026, ¶¶ 2(A)-(B).[10] We will address each argument individually.

The constitutional aspect of these arguments relies upon the well-established precept that "the Due Process Clause of the Fourteenth Amendment prohibits the government from interfering in familial relationships unless the government adheres to the requirements of procedural and substantive due process." *Croft v. Westmoreland Cty. Children & Youth*

---

[10] In addition to the constitutional claims discussed above, Stepfather also asserts that his constitutional right to effective representation by counsel has been violated in the instant appeal. *See* Amended Pro Se Response, 1/5/2026, ¶ 2(G)(3). Stepfather also baldly alleges that Attorney Sontz has failed to comply with the requirements of *Anders*. *See id.*, ¶ 2(G)(4). Viewed in its entirety, we discern that Stepfather's primary complaint is that Attorney Sontz submitted an *Anders* brief instead of an advocate's brief. As we have already stated, Attorney Sontz has complied with the requirements of *Anders*. Furthermore, as detailed below, we agree with his conclusion that Stepfather's appeal is wholly frivolous. Accordingly, we discern no basis upon which to grant Stepfather relief pursuant to these arguments.

***Servs.***, 103 F.3d 1123, 1125 (3rd Cir. 1997). Our Supreme Court has held the protections at Article I, Section 1 of the Pennsylvania Constitution "are not distinguishable" from those of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. ***Pennsylvania Game Comm'n v. Marich***, 666 A.2d 253, 255 n.6 (Pa. 1995). Thus, "we may apply the same analysis" to Stepfather's claims under both the federal and Pennsylvania Constitutions. ***Id.*** These constitutional challenges present questions of law, which we review de novo and our scope of review is plenary. ***See Interest of Y.W.-B.***, 265 A.3d 602, 615 (Pa. 2021).

The record confirms that Stepfather raised these constitutional claims at various points during the underlying dependency proceedings.[11] ***See*** N.T., 8/21/2024, at 34; N.T., 5/10/2024, at 30-33, N.T., 4/19/2023, at 80-82, 155. Stepfather's position is that his constitutional rights afford him an essentially absolute right to refuse the involvement of the state in his parenting decisions. ***See Anders*** Brief at 22-23. We must disagree.

Specifically, this Court has explained that "the right of the parent to control every aspect of a child's life is **not** absolute. When actions concerning a child have a relation to that child's well-being, the state may act to promote these legitimate interests." ***Matter of Cabrera***, 552 A.2d 1114, 1118 (Pa.

---

[11] There is scant caselaw discussing whether stepparents who have assumed parental responsibilities can assert these types of constitutional rights. We assume, without deciding, and solely for the sake of this argument that Stepfather is entitled to these protections.

Super. 1989) (emphasis added; internal citations and quotation marks omitted).[12] "Acting to guard the general interest in youth's well-being, the state as *parens patriae* may restrict the parent's control . . . in many ways." *Id.* (quoting **Prince v. Massachusetts**, 321 U.S. 158, 166-67 (1944)). Thus, "'the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare[.]'" *Id.*

Based upon the reasoning set forth in *Cabrera*, we find no merit to the contention that Stepfather's constitutional rights supersede the state's well-recognized interest in safeguarding C.B.'s welfare. As such, we agree with Attorney Sontz that the constitutional aspect of Stepfather's claims is wholly frivolous.

The remaining discussion contained in Attorney Sontz's **Anders** brief pertains to the sufficiency of the evidence to support the juvenile court's findings pursuant to the factors set forth in section 6351(f)-(f.2) of the

---

[12] In **Cabrera**, this Court adjudicated a matter regarding a parent's religious rights pursuant to Article I, Section 3 of the Pennsylvania Constitution. **See Cabrera**, 552 A.2d at 1117-18. As both a parent's religious rights and the right to familial integrity have been found to be fundamental, and **Cabrera** addresses a parent's rights in the face of intervention by the state, this general principle expressed in **Cabrera** applies with equal force to a parent's constitutional rights to familial integrity. **See Shepp v. Shepp**, 906 A.2d 1165, 1169 (Pa. 2006 (recognizing that "the traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental" constitutional right); **see also Zummo v. Zummo**, 574 A.2d 1130, 1138 (Pa. Super. 1990) ("The custody, care, nurture, and instruction of children resides first in the children's natural parents, as a constitutionally recognized fundamental right.").

Juvenile Act. *See Anders* Brief at 24-36; Amended Pro Se Response, 1/5/2026, ¶¶ 2(A)-(B). The filings by Attorney Sontz and Stepfather collectively challenge the findings with respect to section 6351(f)(1), (3), (5.1), (f.1)(1), and (f.2).[13] *See id.* We will address each subsection in turn.

The Juvenile Act governs the disposition of dependent children. *See In re R.M.G.*, 997 A.2d 339, 345 (Pa. Super. 2010) (internal citation omitted). The pertinent provisions of section 6351(f)-(f.2) provide:

> **(f) Matters to be determined at permanency hearing.**--At each permanency hearing, a court shall determine all of the following:
>
> > (1) The continuing necessity for and appropriateness of the placement.
>
> > \* \* \*
>
> > (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> > \* \* \*
>
> > (5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.
>
> > \* \* \*
>
> **(f.1) Additional determination.**--Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

---

[13] Although Father refers to 42 Pa.C.S. § 6351(5) in his pro se response, we discern that he intended to address his arguments towards section 6351(5.1.) since that subsection concerns the reasonable efforts of CYF to finalize the permanency plan in effect. *Compare* 42 Pa.C.S. § 6351(5)-(5.1) *with* Amended Pro Se Response, 1/5/2026, at 3 (unpaginated).

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

\* \* \*

(3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

\* \* \*

**(f.2) Evidence.**--Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

42 Pa.C.S. § 6351(f)(1), (3), (5.1), (f.1)(1), (f.2).

A petitioning agency has the burden to show a goal change would serve the child's "best interests," and the "safety, permanency, and well-being of the child must take precedence over **all** other considerations" under section 6351. *R.M.G.*, 997 A.2d at 347 (emphasis in original; internal citation and quotation marks omitted). In the context of goal change proceedings, "[t]he parent's rights are secondary." *Id.* With specific reference to a goal change to SPLC, "the [juvenile] court must find that neither reunification nor adoption is best suited to the child's safety, protection and physical, mental and moral

welfare[.]" ***Interest of D.G.***, 241 A.3d 1230, 1241 (Pa. Super. 2020) (internal citation and quotation marks omitted).

Stepfather's first challenge to the juvenile court's factual findings concerns section 6351(f)(1), which pertains to "the continuing necessity for and appropriateness of the placement." 42 Pa.C.S. § 6351(f)(1). Stepfather succinctly submits that "there was no necessity for placement." Amended Pro Se Response, 1/5/2026, at 1 (unpaginated). We disagree.

The juvenile court concluded that C.B.'s ongoing placement as a dependent child remained necessary and appropriate. ***See generally*** N.T., 6/17/2025, at 110-25. Our review indicates that this finding was adequately supported by the evidence in the certified record. As detailed above, the reason for C.B.'s placement related to Stepfather's decision to leave the children unsupervised for extended periods of time, and her continued placement was necessary based upon his failure to comply with court orders or to cooperate with CYF. The certified record clearly establishes that Stepfather never abandoned his position that leaving the children alone for extended periods of time was an acceptable parenting practice. ***See*** N.T., 4/19/2023, at 151-52, 172-74, 181, 189-90. We acknowledge that Stepfather claimed that he was ready to be a stay-at-home father in May 2024. ***See*** N.T., 5/10/2024, at 29. Aside from this self-serving statement, however, Stepfather never made any effort to regain custody of C.B. Following C.B.'s dependency adjudication, he stopped participating in the

dependency proceedings altogether between August 2023 and April 2024, and although he then resumed nominal participation in the proceedings in April 2024, he continued to eschew contact or cooperation with CYF. Stepfather likewise failed to comply with court-ordered evaluations. **See** N.T., 6/17/2025, at 14-15, 28, 31, 37, 65-66. In his testimony, Mr. Clark explained that Stepfather's serial refusals to cooperate with CYF made it impossible for them to accurately assess his status as a caregiver or ascertain his reunification needs. **See id.** at 65-66. Based upon this unchallenged evidence, we observe no abuse of discretion with respect to the juvenile court's findings pursuant to section 6351(f)(1).

Turning to section 6351(f)(3), this element requires the juvenile court to consider "[t]he extent of progress made toward alleviating the circumstances which necessitated the original placement." 42 Pa.C.S. § 6351(f)(3). Stepfather argues that the circumstances that necessitated C.B.'s placement "no longer existed." Amended Pro Se Response, 1/5/2026, ¶ 2(A)(b). The juvenile court, on the other hand, concluded that no appreciable progress had been made towards alleviating the reasons for C.B.'s placement. **See generally** N.T., 6/17/2025, at 110-25. The same evidence that supports the juvenile court's findings pursuant to section 6351(f)(1), detailed above, supports the court's findings pursuant to section 6351(f)(3).

Section 6351(f)(5.1), considers "[w]hether reasonable efforts were made to finalize the permanency plan in effect." 42 Pa.C.S. § 6351(f)(5.1). Stepfather maintains that CYF failed to make reasonable efforts to finalize the permanency plan prior to the entry of the subject goal change order. *See* Amended Pro Se Response, 1/5/2026, ¶ 2(B)(a)-(e). The juvenile court concluded, however, that Stepfather was responsible for the lack of reunification services: "Regarding reunification efforts, it is not possible to reunify a child with a parent who is refusing to engage with CYF or the [juvenile court]." N.T., 6/17/2025, at 123. The juvenile court also detailed Stepfather's extensive history of non-participation in these proceedings. *See id.* at 118-23.

We observe no abuse of discretion in the juvenile court's findings. The certified record demonstrates that the lack of reunification services provided to Stepfather was solely attributable to his ongoing refusal to cooperate with CYF. Thus, no relief is due pursuant to section 6351(f)(5.1).

Stepfather's next argument is that the juvenile court erred by failing to make findings pursuant to section 6351(f.1)(1). *See* Amended Pro Se Response, 1/5/2026, ¶ 2(A)(c). In so arguing, however, Father significantly misapprehends the nature of the findings required pursuant to section 6351(f.1). As quoted above, the juvenile court was only required to issue a finding with respect to section 6351(f.1)(1) if it concluded that "the return of the child is best suited to the safety, protection and physical, mental and

moral welfare of the child." 42 Pa.C.S. § 6351(f.1)(1). Contrary to Stepfather's arguments, courts are only required to issue a single finding pursuant to section 6351(f.1) based upon its findings pursuant to the various elements at section 6351(f). *See* 42 Pa.C.S. § 6351(f.1) (indicating that the juvenile court "shall determine **one** of the following") (emphasis added). Thus, based upon the circumstances of the instant case and the juvenile court's findings, it was only required to issue findings pursuant to section 6351(f.1)(3). *See* 42 Pa.C.S. § 6351(f.1)(3). Based upon the foregoing, no relief is due.

Stepfather's final issue under section 6351 concerns subsection (f.2). Stepfather baldly asserts that "no clear and convincing evidence existed that [Stepfather] placed the health, safety or welfare of [C.B] at risk[.]" Amended Pro Se Response, 1/6/2025, ¶ 2(A)(d). Once again, however, Stepfather misunderstands the nature of the at-issue statute. Section 6351(f.2) only imposes a duty upon **the parties** to produce certain evidence for the juvenile court's consideration. It does not require any particular finding by the juvenile court. *See* 42 Pa.C.S. § 6351(f.2). Here, there is no indication that any party failed to present evidence as required by section 6351(f.2). Since Stepfather has failed to identify any violation of section 6351(f.2), we discern that this claim is also wholly frivolous.

Finally, in his pro se response, Stepfather argues that the juvenile court erred by failing to conduct a bond analysis. *See* Amended Pro Se Response,

1/5/2026, ¶ 2(C)(a)-(c). Contrary to Stepfather's argument, however, the record reflects that the juvenile court concluded that there was no evidence of a parental bond between C.B. and Stepfather based upon the lack of contact between them from January 2023 until the date of the goal change hearing. *See*, N.T., 6/17/2025, at 117. It is well established that, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008).

The juvenile court credited evidence that C.B. was closely and strongly bonded to Foster Mother. The record reflects that Dr. Bliss testified that she observed a "secure attachment" between C.B. and Foster Mother. N.T., 6/17/2025, at 22. Dr. Bliss further averred that C.B. had also expressed her desire to stay with Foster Mother. *Id.* at 23. Based upon the foregoing, we conclude that Stepfather's claim that the court failed to consider parental bond is wholly frivolous.

To summarize our findings above, we agree with Attorney Sontz that the claims raised in his *Anders* brief are wholly frivolous. Our review of the various claims raised by Stepfather in his pro se filings reveals that they, too, also frivolous. Accordingly, Stepfather is not entitled to relief on appeal. We therefore grant Attorney Sontz's application to withdraw and affirm the juvenile court's order.

Application to withdraw granted. Order affirmed.

- 26 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/23/2026